CURTIS T. BUSSE AND MYRTLE BUSSE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6858–70. Filed May 30. 1972.

*John S. Best* and *Robert A. Schnur*, for the petitioners.
*Robert M. Burns*, for the respondent.

OPINION

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for 1967 in the amount of $1,659.47. The only issue for decision is whether a portion of the payments received by petitioners during 1967 as consideration for the sale of a patent was unstated interest within the meaning of section 483.[1]

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

All the facts have been stipulated and are found accordingly.

At the time their petition was filed, petitioners were legal residents of Randolph, Wis. They filed their joint income tax return for 1967 on a cash basis with the district director of internal revenue, Milwaukee, Wis. For convenience, Curtis T. Busse will be referred to herein as petitioner.

Sometime prior to March 20, 1958, petitioner invented new and useful improvements involving a method and machine for stacking cans on pallets. On March 20, 1958, petitioner sold an undivided 50-percent interest in the invention to his brother, Gilbert Busse.

On March 21, 1958, petitioner applied for a patent in respect to such improvements and on August 16, 1960, there was issued to him U.S. Letters Patent No. 2,949,179, entitled "Machine for Stacking Cans on Pallets" (hereinafter referred to as the patent). From that date to January 1, 1966, petitioner was the outright owner of a 50-percent interest in the patent. Under the assignment of March 20, 1958, the initial owner of the other 50 percent was Gilbert Busse. He died on July 10, 1962, and his interest in the patent passed to his widow, Marcella J. Busse.

On January 2, 1966, Busse Bros., Inc. (hereinafter the corporation), was organized under the laws of the State of Wisconsin. From the time of the incorporation through the date of the trial of this case on November 1, 1971, petitioner owned exactly 50 percent of the issued and outstanding stock of the corporation. The other 50 percent of the stock was owned by Marcella J. Busse.

On January 2, 1966, petitioner, Marcella J. Busse, and the corporation entered into an oral agreement whereby petitioner and Marcella J. Busse sold to the corporation their entire right, title, and interest in and to the patent. This oral agreement was reduced to writing in an assignment (hereinafter the assignment) executed on April 28, 1967. As consideration for the sale, petitioner and Marcella J. Busse received the corporation's promise, pursuant to the assignment, to pay to them for the life of the patent—

periodic installments in the amount of 5% of Assignee's net selling price (as hereinafter defined) of palletizers and depalletizers (including parts and kits therefor) sold by assignee which are covered by any claim of said Patent No. 2,949,179.

During the calendar years 1966 and 1967, the corporation paid petitioner $31,433.40 and $36,029.01, respectively, as his 50-percent share of the periodic installments. Petitioner, on his Federal income tax returns for 1966 and 1967, reported those amounts as long-term capital gain.

In the notice of deficiency, respondent determined that, of the

$36,029.01 received by petitioner in 1967, $3,017.20 was ordinary income in that it represented unstated interest within the meaning of section 483. The imputed interest, determined under the formula prescribed in section 483, was computed for 1967 as follows:

BASE DATE JANUARY 2, 1966

| Payment date | Amount | Months | Factor | Principal | Imputed interest |
|---|---|---|---|---|---|
| 6/30/67 | $6,394.18 | 18 | 0.92860 | $5,937.64 | $456.54 |
| 9/30/67 | 10,000.00 | 21 | .92860 | 9,286.00 | 714.00 |
| 12/31/67 | 19,634.83 | 24 | .90595 | 17,788.17 | 1,846.66 |
| | 36,029.01 | | | 33,011.81 | 3,017.20 |

The question is whether the present transaction falls within the unstated-interest provisions of section 483.[2] Subsection (f)(4) of that section excepts from the unstated-interest provisions any payments made pursuant to transfers described in section 1235(a),[3] relating to the sale or exchange of patents. On facts almost identical to the present ones, this Court, in *Floyd G. Paxton*, 53 T.C. 202 (1969), held that no portion of the payments received in exchange for the patent in that case was unstated interest within the provisions of section 483. We concluded that the exception prescribed by subsection (f)(4) of that section applied even though the taxpayer's right to capital gain treatment of his receipts did not stem from section 1235 but was prescribed by other provisions of the Internal Revenue Code of 1954, as amended. No appeal was taken from that decision.

In ordinary circumstances, where an issue has been decided so recently, we would merely state in a subsequent case our adherence to

---

[2] SEC. 483. INTEREST ON CERTAIN DEFERRED PAYMENTS.

(a) AMOUNT CONSTITUTING INTEREST.—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

\*     \*     \*     \*     \*     \*     \*

(f) EXCEPTIONS AND LIMITATIONS.—

\*     \*     \*     \*     \*     \*     \*

(4) SALES OR EXCHANGES OF PATENTS.—This section shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents).

[3] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

the prior opinion. However, respondent urgently insists that our interpretation of sections 483(f)(4) and 1235(a) in *Paxton* was "unrealistically narrow, is erroneous and should not be followed." He asks us to "look beyond the literal wording" of that section in order to effectuate its underlying purpose, and to hold that the exception laid down by section 483(f)(4) to the imputed-interest provision applies only if the sale of a patent qualifies for capital gain treatment under section 1235.

Respondent argues that section 1235 was enacted to encourage inventive activities by granting inventors capital gain treatment on the sale of their patents. He contends that the section 483(f)(4) exception to imputed interest was inserted to assure that the incentive provided by section 1235 would not be reduced by treating any of the capital gain as imputed ordinary interest income. Since petitioner's right to capital gain treatment of his receipts from his patent is not derived from section 1235 but from other Code provisions,[4] respondent maintains that it would be illogical to conclude that Congress intended the section 483(f)(4) exception to apply in a situation like this one. His argument is keyed to the proposition that "the instant deferred sale to a related corporation was not a 'transfer,' as that term is defined in section 1235(d)," and that the transaction should be viewed as an ordinary sale of a capital asset rather than a "transfer" of a patent within the meaning of section 1235(a).

This Court has recently stated that, in construing the Code, it will seek to effectuate the congressional intent rather than follow "a slavish unreasoning adherence to the literal reading of the statute." *International Trading Co.*, 57 T.C. 455, 461 (1971), on appeal (C.A. 7, May 11, 1972). However, there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States* v. *Amer. Trucking Ass'ns.*, 310 U.S. 534, 543 (1940); *Silvio Gutierrez*, 53 T.C. 394, 400 (1969), affd.     F. 2d     (C.A. D.C. 1971). Unless the language of the statute is plainly at variance with the legislative policy, we cannot look beyond the normal meaning of the words chosen by Congress. We cannot depart from the statutory language to effectuate what we may merely surmise was the congressional purpose. Cf. *General Electric Co.* v. *Burton*, 372 F. 2d 108, 111 (C.A. 6, 1967). Respondent's argument must be examined in the light of these principles.

Prior to the enactment of section 483, an individual could sell a capital asset on an installment basis without making any specific provi-

---

[4] Respondent concedes, pursuant to Rev. Rul. 69–482, 1969–2 C.B. 164–165, that petitioner is entitled to capital gain treatment of his receipts. We accept for the purpose of this case the correctness of that concession.

sions for interest payments on the installments. In such cases, the full difference between the cost or other basis for the property and the sales price usually was treated as capital gain to the seller. Thus, the parties could, by the wording of the sales agreements, partially determine the character of the income received from a sale. The committees of Congress were of the view that "manipulation of the tax laws in such a manner * * * [was] undesirable" and recommended "corrective action" in the form of what ultimately became section 483. H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 196; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 606.

Section 483 provides, in general terms, that if property is sold for payments, part or all of which are due more than 1 year after the date of the sale, and if no interest payments are required or if the specified interest is to be computed at an unreasonably low rate, then part of each payment shall be treated as interest. But this provision does not apply to all contracts of sale. It contains several specific exceptions. The one with which we are here concerned is that in section 483(f)(4) which provides that section 483 "shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents)."

What kind of "transfer" is "described" in section 1235(a)? That subsection provides generally that a "transfer" of property consisting of all substantial rights to a patent or an interest therein by a holder shall be considered the sale or exchange of a capital asset held for more than 6 months. This rule is to be applied regardless of whether or not payments in consideration of the transfer are (1) payable over a period coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred.

Standing alone, these provisions of section 1235(a) describe precisely petitioner's transfer. Respondent at least implicitly concedes that this is true, but he points out that section 1235(d) limits the application of section 1235(a) by providing that section 1235(a) "shall not apply to any transfer, directly or indirectly," between related persons, including a sale to a related corporation. Since the sale by petitioner was to a related corporation, respondent contends that such sale is not governed by section 1235 and, therefore, is not "described in section 1235(a)" within the meaning of that phrase as used in section 483(f)(4).

Respondent's position depends on the premise that section 483(f)(4) should not be read literally but that the phrase "described in section 1235(a)" should be interpreted as meaning "governed by or qualifying under section 1235(a)." Although respondent concedes that petitioner is entitled to long-term capital gain treatment of the proceeds of his patent sale, he points out that such treatment is not attributable to sec-

tion 1235(a) but to other Code provisions. On this ground he would impute interest to petitioner.

However, respondent offers no explanation why, if his position is correct, section 483(f)(4) refers to section 1235(a) rather than to section 1235 as a whole.[5] Moreover, when the Treasury Department had the opportunity to interpret the language of section 483(f)(4) so that it would serve what respondent now says was its legislative purpose, it did not promulgate regulations which support his present position. Rather, section 1.483–2(b)(4), Income Tax Regs., states:

> *Sales or exchanges of patents.* Section 483 does not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents). The preceding sentence does not apply to transfers which are not described in section 1235(a) but which receive capital gain treatment under another section of the Code.

Thus, the regulation refers to transfers which are *not* "described in section 1235(a)"; it does nothing to limit the section 483(f)(4) exception where, as in the instant case, the transfer *is* "described in section 1235(a)" but receives capital gain treatment under other provisions of the Code.

As this Court noted in *Floyd G. Paxton, supra* at 206:

> The clear language of both the statute and the regulation supports petitioner's position. As petitioner says, the transaction which he entered into with * * * [the corporation] is a transaction described in section 1235(a) even though that section is made inapplicable to him by the provisions of section 1235(d). * * *

Furthermore, we have found no persuasive evidence that Congress wanted to restrict the benefits of section 483(f)(4) in the manner advocated by respondent. Clearly, the expression of congressional intent found in the Senate Finance Committee report does not show a desire to adopt a policy which restricts those benefits only to situations where capital gain treatment is allowed by section 1235. Indeed, that report (S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 505) broadly states (p. 607) that "[section 483] is not to apply in the case of payments with respect to patents, which are treated as capital gain under present law."

Nor does the limitation on the scope of the section 483(f)(4) exception follow necessarily from the reasoning behind the adoption of section 1235. As respondent correctly represents, section 1235 was designed to encourage inventors by relaxing and clarifying the requirements for obtaining favorable, capital gain rates for the proceeds derived from the sales of their inventions. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 113–114,

---

[5] Compare secs. 871(a)(1)(B) and 1441 (b) and (c)(5) where the statutory language is "described in section 1235."

438–441 (1954). In line with this objective, the benefits of section 1235 were extended only to "holders"—i.e., the inventors and those individuals, other than employers and persons related to inventors, who helped finance the inventors' projects. Sec. 1235(b). These favorable rules are to be applied to all inventors, both professionals and amateurs, as well as their financiers. The incorporation of section 1235(a) into section 483(f)(4) merely extends the legislative policy of encouraging the inventive work of such persons.

Admittedly, not all sales made by holders of patents are governed by section 1235. Sec. 1.1235-1(b), Income Tax Regs.[6] Certain sales, such as the one in the instant case, are excluded from the application of that section by section 1235(d), relating to transfers between related persons, and are controlled by other provisions of the Code. However, we find nothing in the legislative policy underlying section 1235(d) which indicates that such sales by holders were not intended to fall within the subsection 483(f)(4) exception.

Subsection (d) was included in section 1235 in order to forestall possible abuses of the favorable treatment afforded by that section[7] to sales of patents. It excludes from the operation of section 1235 sales of patents "within essentially the same economic group." S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 441 (1954).[8] Significantly, subsection (d) does not achieve its objective, as argued by respondent, by *defining* the term "transfer"; rather, it provides that subsection (a) "shall not apply" to certain types of transfers. The result is that subsection (d) limits the application of section 1235 but does not restrict the scope of the definitional or descriptive provisions found in subsections (a) and (b). Consequently, references in other Code provisions to section 1235(a) relate to all patent transfers made by holders. Respondent's argument appears to ignore this difference in the structures and legal effects of subsections

---

[6] Sec. 1.1235-1(b), Income Tax Regs., is as follows:

(b) *Scope of section 1235.* If a transfer is not one described in paragraph (a) of this section, section 1235 shall be disregarded in determining whether or not such transfer is the sale or exchange of a capital asset. For example, a transfer by a person other than a holder or a transfer by a holder to a related person is not governed by section 1235. The tax consequences of such transfers shall be determined under other provisions of the internal revenue laws.

[7] This favorable treatment does more than apply the capital gains rates to sales of patents by amateur and professional inventors alike—it eliminates the holding-period requirements and, under certain circumstances, resolves the question of whether there has been a sale or exchange rather than a mere license of the patent.

[8] The language of S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 441 (1954), pertinent to the instant case, is as follows: "It is not considered that this limitation will in any way narrow the opportunity of inventors to dispose of their patents through normal business channels; on the other hand, this limitation should prevent possible abuses arising from the sale of patents within essentially the same economic group."

(b) and (d),[9] a difference which we are unable to find was merely fortuitous.

Moreover, the benefits conferred by sections 483 (f) (4) and 1235 are different, and we do not think it unreasonable that the transactions to which those benefits are extended may differ. Section 1235 was intended to clarify and, in certain cases, extend the area in which capital gain treatment may be obtained on transfers of patents.[10] However, as noted above, to avoid expanding the area in which such transfers within the same economic group are entitled to capital gain treatment, Congress adopted the exclusionary provisions of subsection (d). Respondent concedes that by excluding from the operation of section 1235 transfers to related persons, Congress did not preclude them from receiving capital gain treatment. In the words of the regulation, "The tax consequences of such transfers shall be determined under other provisions of the internal revenue laws." Sec. 1.1235-1(b), Income Tax Regs.

Section 483 (f) (4), on the other hand, does not involve a question of expanding favorable tax treatment in cases of transfers within an economic group. Rather, it exempts from the operation of the imputed-interest provisions all capital-gain-producing transfers of patents by

---

[9] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(A) the employer of such creator, nor

(B) related to such creator (within the meaning of subsection (d)).

\*        \*        \*        \*        \*        \*        \*

(d) RELATED PERSONS.—Subsection (a) shall not apply to any transfer, directly or indirectly, between persons specified within any one of the paragraphs of section 267(b) ; except that, in applying section 267 (b) and (c) for purposes of this section—

(1) the phrase "25 percent or more" shall be substituted for the phrase "more than 50 percent" each place it appears in section 267(b), and

(2) paragraph (4) of section 267(c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants.

[10] The problem to which sec. 1235 was addressed and the solution which it afforded were described in S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 113–114 (1954), as follows :

"Under present law an amateur inventor may receive capital gains treatment on the outright sale of his patent but a professional may not. However, if a sale arrangement results in royalty income, rather than installment payments, even an amateur inventor faces uncertainty as to whether he receives capital gains or ordinary income tax treatment.

"The present distinction between amateur and professional inventors and between royalty income and installment payments is both arbitrary and confusing since, due to the inherent uncertainties, a royalty type of arrangement is the reasonable way for an inventor to sell a patent. Moreover, the present treatment tends to discourage scientific work.

\*        \*        \*        \*        \*        \*        \*

"[The section] means that any income from an assignment or an exclusive license agreement which qualifies as a sale or exchange, in the hands of a qualified assignor or licensor, will be capital gains, whether or not it depends on the profitable use of the patent by the assignee or licensee."

the favored group of individuals (holders). We can conceive of no legislative policy reason why patent transfers by holders to related persons which are taxed in the same manner as other patent transfers by holders should be treated differently for purposes of section 483 (f) (4). Certainly, there are no reasons which are so obvious as to warrant our disregard of the plain language of section 483 (f) (4) and the regulations issued thereunder.

We adhere to our decision in *Floyd G. Paxton, supra.* Our study of sections 483 and 1235 fails to disclose any clearly defined legislative policy which is at plain variance with the language of section 483 (f) (4). We conclude that Congress intended, as it stated, to extend the exception to the imputed-interest provisions to all transfers of patents described in section 1235 (a).

*Decision will be entered for the petitioners.*