DANIEL K. LUDWIG AND GERTRUDE V. LUDWIG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5764–75. Filed September 29, 1977.

*Richard G. Cohen, Gary I. Fritzhand,* and *R. Palmer Baker, Jr.,* for the petitioners.

*Larry Kars,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for 1963 in the amount of $4,438,086.75. After various concessions by the parties, the sole issue remaining for decision is whether a controlled foreign corporation wholly owned by petitioner Daniel K. Ludwig was a guarantor, within the meaning of section 956(c),[1] of petitioner's obligations to a group of lending banks, with the result that income was realized by petitioner under section 951.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. References hereinafter to subpart F are to secs. 951 through 964, dealing with controlled foreign corporations.

Petitioners Daniel K. Ludwig (hereinafter petitioner) and Gertrude V. Ludwig, husband and wife, are citizens of the United States, residing in New York, N.Y. They filed a joint Federal income tax return for 1963 with the Internal Revenue Service, New York, N.Y. Gertrude V. Ludwig is a party hereto solely by reason of having filed a joint return.

In June 1963, petitioner entered into an agreement with Phillips Petroleum Co. (hereinafter Phillips), providing for the purchase by petitioner from Phillips of 1,340,517 shares of stock of Union Oil Co. (hereinafter Union Oil). These shares represented Phillips' entire holding in Union Oil, and amounted to approximately 15 percent of Union Oil's total outstanding stock. The purchase price was $75 per share, or a total of $100,538,775.

Pursuant to the purchase agreement, the parties were required to obtain, and they eventually did obtain, (a) the consent of the Antitrust Division of the U.S. Department of Justice to the sale by Phillips of its Union Oil stock to petitioner and (b) the consent to the sale by Phillips of its Union Oil stock to petitioner, pursuant to a preliminary injunction of January 1961, of the United States District Court for the Southern District of California in the matter of *United States v. Phillips Petroleum Co.*

In order to pay for the 1,340,517 shares of Union Oil, petitioner arranged to borrow the entire amount of the purchase price from three banks—Chase Manhattan Bank (Chase Manhattan), Chemical Bank New York Trust Co. (Chemical Bank), and Bank of America National Trust & Savings Association (Bank of America). Chase Manhattan served as agent for the lending banks in negotiating the loan agreement with petitioner. All negotiations as to the terms and conditions of the loan agreement (other than those concerning the amount of participation of each of the lending banks) were conducted by Chase Manhattan as agent for the lending banks.

Part of the negotiation of the loan agreement involved the collateral to be used to secure the loan. Under Regulation U, Federal Reserve Board, 12 C.F.R., Part 221 (1963) (hereinafter Regulation U), a loan of this type (for the purchase of a security listed on a national securities exchange) was required

to be secured by collateral having a value of at least twice the amount of the loan. Petitioner offered and the banks accepted as collateral the 1,340,517 shares of Union Oil stock to be acquired by petitioner with the loan proceeds, plus 1,000 shares of Oceanic Tankships, S.A. (Oceanic).

Oceanic was a Panamanian corporation which, during 1963, had 1,000 shares of stock outstanding, all of which were owned by petitioner. During the taxable year 1963, Oceanic's assets consisted primarily of all of the outstanding stock of Universe Tankships, Inc. (Universe), a Liberian corporation engaged principally in the business of owning and operating oceangoing vessels. As of December 31, 1963, Oceanic had accumulated earnings and profits of $5,092,318. At the time Chase Manhattan agreed to accept the stock of Oceanic as collateral for petitioner's loan, it determined that such stock had a value at least equal to its book value of approximately $200 million. Thus, the total collateral for the loan (the Union Oil stock plus the Oceanic stock) was valued by the lending banks at approximately $300 million.

In order to protect the value of the Oceanic stock held as collateral, the banks required of petitioner certain negative covenants restricting his absolute control over the assets and liabilities of Oceanic and Universe during the term of the loan. These restrictions were set forth in the loan agreement and included, in part, the borrower's covenants not to cause Oceanic or Universe to do any of the following without the consent of the lenders:

(1) Borrow money, except in connection with shipping operations;

(2) Pledge assets as collateral, except as to borrowings in connection with shipping operations;

(3) Guarantee, assume, or become liable on the obligation of another, or invest in or lend funds to another, except to the extent of $40 million total;

(4) Merge or consolidate with any other corporation;

(5) Sell or lease (other than in the ordinary course of business) or otherwise dispose of any substantial part of its assets;

(6) Transfer any shares of any controlled subsidiary;

(7) Pay or secure any amount owing by Oceanic or Universe to petitioner;

(8) Pay any dividends, except in such amounts as may be required to make interest or principal payments on petitioner's loan from the lending banks.

The principal purpose of these negative covenants was to protect the lenders against possible actions by petitioner, as the controlling stockholder of Oceanic and (through Oceanic) Universe, which could diminish the value of the Oceanic stock held as collateral. This kind of protection was critical in satisfaction of Regulation U requirements concerning the value of collateral. With the protection of the negative covenants the lending banks could look to the value of the Oceanic stock as their source of recovery in the event of default in repayment by petitioner. In the event of such default the banks expected to be able to sell the pledged Union Oil and/or Oceanic stock to satisfy their claims.

In July 1963, the loan agreement was concluded and petitioner issued personal promissory notes to the lending banks as follows:

| | |
|---|---|
| Chase Manhattan... | $50,269,387.50 |
| Chemical Bank ....... | 40,000,000.00 |
| Bank of America .... | 10,269,387.50 |
| Total.............. | 100,538,775.00 |

In that same month, petitioner completed his purchase of the Union Oil stock.

During 1963 through 1965, the board of directors of Oceanic held meetings and kept minutes of these meetings. Such minutes do not reflect any discussion of or reference to petitioner's purchase of Union Oil stock or the loan agreement pursuant to which his Oceanic stock was pledged as collateral.

Subsequent to the execution of the loan agreement, the agreement was amended twice to extend the maturity date of the first installment repayment. The second such amendment extended the maturity date to July 19, 1965. On or about July 20, 1964, petitioner paid from his personal account $2,484,627.26 in interest on the loan. On or about December 23, 1964, petitioner paid from his personal account an additional $2,075,672.63 in interest.

On or about February 17, 1965, petitioner sold all the Union Oil stock purchased on July 19, 1963, to Union Oil for $35.50

per share ($106.50 per share if the price is adjusted for a 3-for-1 stock split which took place in 1964). This resulted in a gain of $45,152,943.87. From the proceeds of this sale, on February 17, 1965, petitioner repaid to the lending banks the loan principal and all remaining interest to date. The gain on the sale was duly reported on petitioners' joint Federal income tax return for 1965. That return showed a tax liability of $11,471,413.78, which was paid.

### ULTIMATE FINDING OF FACT

Oceanic was not a guarantor of petitioner's obligations to the lending banks.

### OPINION

Under section 951(a)(1)(B), a United States shareholder of a controlled foreign corporation is required to include in gross income his pro rata share of such corporation's increase in earnings invested in United States property during the taxable year. Section 956 (a)(1)[2] provides that the amount of the earnings of a controlled foreign corporation invested in United States property for the taxable year is the aggregate amount of such property held, directly or indirectly, at the close of the taxable year but only to the extent that the amount thereof would have constituted a dividend if such amount had been distributed during the year. See sec. 1.956–1(a), Income Tax Regs.

Section 956(b)(1)(C)[3] provides that the term "United States property" includes an obligation of a "United States person." Thus, if a controlled foreign corporation makes a loan to its

---

[2] SEC. 956. INVESTMENT OF EARNINGS IN UNITED STATES PROPERTY.
(a) GENERAL RULES.—For purposes of this subpart—
    (1) AMOUNT OF INVESTMENT.—The amount of earnings of a controlled foreign corporation invested in United States property at the close of any taxable year is the aggregate amount of such property held, directly or indirectly, by the controlled foreign corporation at the close of the taxable year, to the extent such amount would have constituted a dividend (determined after the application of section 955(a)) if it had been distributed.

[3] Sec. 956(b)(1)(C) provides as follows:

(b) UNITED STATES PROPERTY DEFINED.—
    (1) IN GENERAL.—For purposes of subsection (a), the term "United States property" means any property acquired after December 31, 1962, which is—
        * * *
    (C) an obligation of a United States person; * * *

shareholder, a United States person, the obligation to repay the loan is United States property and the shareholder thereby realizes income under section 951. Section 956(c) goes further and provides that a controlled foreign corporation shall be considered as holding an obligation of a United States person if such corporation is, under regulations issued by the Secretary of the Treasury, a "guarantor" of such obligation.

In the instant case, petitioner was a United States shareholder of a controlled foreign corporation, Oceanic. As of December 31, 1963, that corporation had accumulated earnings and profits of $5,029,318 which, if distributed to petitioner, would have constituted a dividend. In that year, petitioner pledged his Oceanic stock to the lending banks in connection with the Union Oil stock purchase. Respondent contends that Oceanic thereby became a "guarantor," within the meaning of section 956(c), of petitioner's obligation to the lending banks. On this theory, respondent maintains, petitioner realized taxable income under section 951 to the extent of Oceanic's undistributed earnings and profits of $5,029,318.

We do not agree.

Section 956(c), on which respondent relies, is as follows:

For purposes of subsection (a), a controlled foreign corporation shall, under regulations prescribed by the Secretary or his delegate, be considered as holding an obligation of a United States person if such controlled foreign corporation is a pledgor or guarantor of such obligation.

Neither the Code nor the related regulations define the term "guarantor" for purposes of section 956(c). In the absence of any such specific technical definition, the term should be given its normal and customary meaning. *Hanover Bank v. Commissioner,* 369 U.S. 672, 687 (1962), revg. sub nom. *Gourielli's Estate v. Commissioner,* 289 F.2d 69 (2d Cir. 1961), affg. 33 T.C. 357 (1959); *United States Gypsum Co. v. United States,* 253 F.2d 738, 744 (7th Cir. 1958); *First Savings & Loan Assn. v. Commissioner,* 40 T.C. 474, 482 (1963). Black's Law Dictionary defines "guarantor" as one who makes a guaranty, and defines "to guaranty" as follows (Black's Law Dictionary, 833 (rev. 4th ed. 1968):

To undertake collaterally to answer for the payment of another's debt or the performance of another's duty, liability, or obligation; to assume the responsibility of a guarantor; to warrant.

This Court had occasion to define the term "guaranty" in *Perry v. Commissioner,* 47 T.C. 159, 163 (1966), affd. 392 F.2d 458 (8th Cir. 1968), as follows:

'an undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another, and which binds the obligor to performance in the event of nonperformance by such other, the latter being bound to perform primarily.' 24 Am. Jur., Guaranty, sec. 2, p. 873–874.

See also *Underwood v. Commissioner,* 63 T.C. 468, 475 (1975), affd. 535 F.2d 309 (5th Cir. 1976). The term has been similarly defined in the case law of New York, the State in which petitioner's loan agreement was executed, and the loan agreement states that it is governed by New York law. See, e.g., *Pink v. Investors Syndicate Title & Guar. Co.,* 246 App. Div. 172, 285 N.Y.S. 155 (3d Dept. 1936), affd. 273 N.Y. 483, 6 N.E.2d 414 (1936); *Aquavella v. Harvey,* 330 N.Y.S.2d 560, 563 (Monroe County Sup. Ct. 1972), affd. 40 App. Div.2d 940, 337 N.Y.S.2d 611 (4th Dept. 1972).

Two essential elements in the nearly uniform definitional language of these cases are (1) an undertaking or promise on the part of the guarantor and (2) a liability of the guarantor to make payment if the primary obligor fails to do so. Both of these critical elements are missing in the instant situation. The alleged guarantor, Oceanic, did not undertake or promise anything. Oceanic took no action whatsoever in connection with petitioner's debt to the lending banks. In the event that petitioner had failed to pay his obligation, Oceanic's pledged stock might have been sold to another, but Oceanic would have had no liability to make any payment. Thus, Oceanic can hardly be considered to have made a guaranty within the usual meaning of that term.

This being the case, section 951 is not applicable, unless the word "guarantor" as used in section 956(c) has a unique meaning and consequence beyond its normal usage. This is, in effect, what respondent would have us hold in this case. Although this issue has not previously been litigated, respondent's position has been spelled out in a revenue ruling which was adopted after the notice of deficiency was issued in the instant case.[4] Rev. Rul. 76–125, 1976–1 C.B. 204, concluded

---

[4] This 1976 ruling was issued in the year following the year in which the notice of

that a stock pledge transaction, almost identical in form to the instant one, had the same effect of indirect repatriation of the controlled foreign corporation's income as if such corporation had itself guarantied the controlling stockholder's obligation. The following language from Rev. Rul. 76–125, *supra* at 204–205, sets forth the rationale on which respondent relies:

> The purpose of section 956 of the Code is to terminate the tax deferment privilege with respect to the earnings of controlled foreign corporations when such earnings are directly or indirectly repatriated. *S. Rep. No. 1881,* 87th Cong., 2d Sess. 80, 87–88 (1962), 1962–3 C.B. 707 at 794, states, in part, "Generally, earnings brought back to the United States are taxed to the shareholders on the grounds that this is substantially the equivalent of a dividend being paid to them." Consistent with the intent of section 956, section 956(c) is interpreted to hold that use of the assets or credit of a controlled foreign corporation as collateral for an obligation of a United States person shall be considered a repatriation of earnings.
>
> The loan agreement in the instant case indicated it was the intention of the parties that if *A* [the U.S. controlling stockholder] defaulted on the loan *X*'s [the controlled foreign corporation's] assets * * * would be available to answer for the debt of *A*. Thus, although the agreement was signed by *A* for himself only, the net effect of the agreement was the same as a guaranty by *X* of the loan to *A*. Under section 956(c) of the Code, *X* must therefore be considered as holding *A*'s obligation, which is defined as United States property under section 956(b)(1)(C).

The premise of this ruling is that the loan agreement indicated it was the "intention" of the parties that if the controlling United States shareholder defaulted on the loan the foreign corporation's assets would be available to answer for the debt. There is no evidence of any such "intention" in the instant case. To the contrary, the loan agreement gave the lending banks the remedies normally associated with pledge foreclosures.[5] Sale of the pledged asset is the remedy

---

deficiency was issued to petitioners in this case (1975). The courts have not looked with favor upon bootstrapping revenue rulings issued shortly prior to the initiation of litigation. *Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272, 279 (1966), revg. 335 F.2d 15 (2d Cir. 1964), affg. a Memorandum Opinion of this Court (a "sudden and unwarranted volte-face from a consistent administrative and judicial practice"); *Busse v. Commissioner,* 479 F.2d 1147, 1152 n. 12 (7th Cir. 1973), affg. 58 T.C. 389 (1972) ("no effect and force"); *Norfolk Shipbuilding & Drydock Corp. v. United States,* 321 F.Supp. 222, 226 (E.D. Va. 1971) ("the Commissioner's own assessment of Norfolk Ship's position").

[5] Under the terms of the loan agreement, the lending banks' principal remedies were substantially as follows:

(1) The lending banks could sell the pledged collateral at public or private sale after giving the borrower 10 days' written notice of their intention to make such sale;

ordinarily followed in case of default and foreclosure. It seems clear that, under usual principles of law applicable to the disposition of collateral for a loan, the banks could not have directly liquidated Oceanic; they would first have had to acquire the Oceanic stock as a purchaser on a foreclosure sale. See footnote 5. We find no basis for questioning the testimony of the officer of Chase Manhattan who negotiated the loan that had the banks foreclosed the pledge they would have sold Oceanic's stock and, further, that to have attempted to liquidate Oceanic and sell its assets would have been impracticable.[6] Thus, this crucial premise on which the ruling is based is lacking in the instant case.

Moreover, Rev. Rul. 76–125, *supra* at 205, incorrectly reasons that "although the agreement was signed by * * * [the United States shareholder] for himself only, the net effect of the agreement was the same as a guaranty." Had Oceanic guarantied the bank loans in the manner described in section 956(c), it would have subjected itself to a contingent liability to pay the loans if petitioner defaulted. In those circumstances and in case of petitioner's default, the banks could have sued Oceanic for the unpaid balance of the notes and enforced their rights as creditors of Oceanic. Section 956(c) treats such use of the controlled foreign corporation's credit as an indirect repatriation of funds sufficient to trigger the realization of income under section 951.

However, the stock pledge in the instant case had no such current or future effect upon Oceanic's assets and liabilities. Oceanic assumed no liability, contingent or otherwise, to pay petitioner's loans. In case of petitioner's default on the bank loans, the banks might have foreclosed the pledge and sold the Oceanic stock. But the new owner purchasing at the foreclosure sale would have acquired stock with the same

---

or

(2) The lending banks could proceed by a suit in law or equity to foreclose the pledge and sell the pledged collateral under a judgment or decree of a court; and

(3) The lending banks were required to apply the proceeds of any sale of the pledged collateral to the payment of selling expenses, interest on the loan, and principal on the loan; any surplus to be paid to the borrower.

[6] The Chase Manhattan officer testified:

"The idea of liquidating [Oceanic] is nothing less than outrageous. Think of the troubles that you'd have in going through trying to get a new Board of Directors and everything else. You don't try to make life complicated for yourself. You get rid of it [the pledged stock] and get your loan paid. Period."

value as it would have had if no pledge had occurred. The banks would have had no remedy against Oceanic. Thus, the net effect of the stock pledge was not the same as a guaranty.

That petitioner realized a benefit from owning and pledging his Oceanic stock to secure the bank loans does not mean that Oceanic's earnings were invested in United States property within the meaning of section 951. Neither that section nor section 956(c) reaches every benefit derived from the ownership of stock in a controlled foreign corporation. In a real sense, the owner of such stock gains financially from every increase in its value, including increases attributable to an accumulation of earnings. Such value increases may so enhance his net worth as to enable him to borrow more money than he could have borrowed otherwise. But such an economic benefit does not trigger the realization of income. The owner realizes income under sections 951 and 956(a)(1) only when the controlled foreign corporation's earnings are invested in United States property. Neither a pledge of the controlled foreign corporation's stock to secure a shareholder's loan nor the listing of such stock on a balance sheet as evidence to support a loan, constitutes an investment of earnings in United States property. Only by reason of section 956(c) does the controlled foreign corporation's guaranty of its shareholder's indebtedness constitute such an investment in United States property, and the language of that section does not include a pledge of the controlled corporation's stock.

Respondent attempts to minimize this distinction between a shareholder's pledge of the corporation's stock and the corporation's guaranty of the loan by arguing that the ultimate basis of the lender's security in either case is the underlying assets of the corporation (and, thus, the shareholder-borrower indirectly utilizes these assets). Respondent relies heavily upon the negative covenants (detailed in our Findings) in petitioner's loan agreement in which petitioner is required, as controlling stockholder, to refrain from certain actions with respect to Oceanic's operations and net worth during the term of the loan. Respondent interprets these negative covenants as intended to preserve the assets of the corporation for access by the lenders in the event of petitioner's default.

However, the record amply demonstrates that covenants of this character, restricting the borrowing of funds, the sale of certain assets, or payment of dividends and forbidding gratuitous guaranties, are not at all uncommon. A breach of the restrictions or prohibitions ordinarily constitutes an event of default which permits acceleration of the loan. The Chase Manhattan officer who arranged the loan explained that unless "the loan is so strong that you don't need the protection of the collateral at all, it [inclusion of negative covenants in a loan agreement] is almost a necessity." He further testified that the negative covenants included in the instant loan agreement were less restrictive than those usually found in an agreement of this kind.

The purpose of the negative covenants in the instant case was not, as respondent argues, to enable the lending banks, in the event of petitioner's default, to enforce their claim against Oceanic or its assets. Their purpose was to protect the value of the pledged Oceanic stock as security for the loans. As pointed out in our Findings, the loan was made subject to the provisions of Regulation U which required the banks to make certain at all times that the value of all the pledged security was at least twice the amount of the loan. As discussed above, the recourse of the lenders in the event of petitioner's default would have been to sell the pledged Oceanic stock, not to attempt to recover through direct access to Oceanic's assets.

We think Rev. Rul. 76–125, *supra,* and respondent's position in this case attempt to stretch the statute and regulations to cover a situation with which they do not deal. True, the legislative history of subpart F in which sections 951 and 956 appear makes it quite clear that one of its objectives is to tax United States shareholders of controlled foreign corporations on the indirect repatriation of income earned by such corporations but not distributed as dividends (and in many instances, not subjected to tax by the jurisdiction of incorporation). S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 794; H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 462. As noted above, an obvious form of such indirect repatriation would be a loan from the controlled foreign corporation to its controlling stockholder(s). This is dealt with specifically in section 956(b)(1)(C), quoted in footnote 3 *supra.*

Less directly, the controlling stockholders could derive nearly identical benefits by borrowing funds from another source and having the loan guarantied by the controlled foreign corporation or secured by a pledge of such corporation's assets. Such use of the credit or assets of the controlled foreign corporation indirectly effects a repatriation of available earnings. Section 956(c) was enacted specifically to cover these more subtle forms of indirect repatriation. S. Rept. 1881, *supra,* 1962–3 C.B. at 956.

But section 956(c) says nothing about pledging the stock of the controlled foreign corporation. Moreover, although that section specifically authorizes the Secretary or his delegate to prescribe regulations for its detailed application, the present regulations do not contain any provisions expanding the guaranty concept to include a pledge of the controlled foreign corporation's stock. Indeed, the regulations dealing with the treatment of pledges and guaranties, in substance, follow the statute. They are cast in terms which assume that "pledgor" and "guarantor" have their normal meaning except that one example explains that the guarantor concept includes an agreement by the controlled foreign corporation to buy the note at maturity if the United States person does not repay the loan. Sec. 1.956–2(c)(1), Income Tax Regs.

Another regulation, defining the term "acquired," provides that property which is an obligation of a United States person "with respect to which a controlled foreign corporation is a pledgor or guarantor" shall be considered acquired when "such corporation assumes liability as a pledgor or guarantor." Sec. 1.956–2(d)(1)(*b*), Income Tax Regs.[7] A corporation does not assume a liability as pledgor or guarantor unless it is a party to the transaction. Thus, the regulation contemplates that section 956(c) is applicable only where the guarantor—

---

[7] Sec. 1.956–2 Definition of United States property.

(d) *Definitions—*(1) *Meaning of "acquired"—*(i) *Applicable rules.* For purposes of paragraph (a) of this section—

* * *

(*b*) Property which is an obligation of a United States person with respect to which a controlled foreign corporation is a pledgor or guarantor (within the meaning of paragraph (c)(1) of this section) shall be considered acquired when such corporation assumes liability as a pledgor or guarantor; * * *

the controlled foreign corporation—is a party to the transaction, not when its stock is merely pledged.[8]

While we are aware that in most cases the value of stock as collateral will be based at least in some part upon the value of the underlying corporate assets (including undistributed income), the extent of the importance of such assets will vary from case to case. In many instances, the going-concern value of the company or the market value of the stock in the public securities market will have more significance than the value of the company's assets. In fact, it is conceivable that stock could be used as collateral in a case where the corporation has no significant tangible assets (or has liabilities substantially offsetting or exceeding the amount of its assets). Thus, the extent to which the stockholder of a controlled foreign corporation derives a benefit from the assets of the corporation is much less certain in the case of a pledge of stock than in the case of a direct commitment of its assets or credit by the corporation. We think that was the rationale followed by the draftsmen of section 956 in stopping short of including the stock pledge transaction. Had Congress intended to cover the stock pledge arrangement, it could have, and would have, done so. *Boykin v. Commissioner*, 260 F.2d 249, 254 (8th Cir. 1958), affg. in part and revg. in part 29 T.C. 813, 817 (1958).

Whether this distinction explains the omission of the stock pledge type of transaction from section 956(c) or whether the omission was an oversight, we can find no basis for respondent's expansive interpretation of that section in the statutory language, its legislative history, or the implementing regulations. If the draftsmen's handiwork fell short of

---

[8] Regulations promulgated pursuant to specific grant of authority in the applicable Code section are ordinarily given great weight by the courts. *Helvering v. Wilshire Oil Co.*, 308 U.S. 90 (1939), revg. 95 F.2d 971 (9th Cir. 1938), affg. 35 B.T.A. 450 (1937); see *Koshland v. Helvering*, 298 U.S. 441 (1936), revg. 81 F.2d 641 (9th Cir. 1936), revg. a Memorandum Opinion of this Court. Conversely, this Court has been reluctant to sustain expansive interpretations of statutory language by the Commissioner when, as here, such interpretations have *not* been promulgated in regulations despite such a specific grant of interpretive regulatory authority. See *Reaver v. Commissioner*, 24 T.C. 72, 80–81 (1964); *Henry C. Beck Builders, Inc. v. Commissioner*, 41 T.C. 616, 628–629 (1964). Had the Secretary or his delegate, charged with responsibility for drafting the applicable regulation, thought sec. 956(c) was applicable when a controlled foreign corporation's stock was pledged, the regulation would have said so. Failure to include such a provision in the regulation suggests that the Secretary or his delegate thought the statute would not accommodate that interpretation.

fully accomplishing the objectives sought, it must be left to Congress to repair such shortfall. Accordingly, we hold that petitioner did not realize gross income under section 951 by reason of his pledge of his Oceanic stock as collateral for his loan from the lending banks.

To reflect the foregoing,

*Decision will be entered under Rule 155.*