KEN LINSEMAN, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 23315–81.     Filed March 26, 1984.

---

*Howard J. Schwartz*, for the petitioner.
*Donald Rightnour*, for the respondent.

TANNENWALD, *Judge*: Respondent determined a deficiency of $5,079 in petitioner's Federal income tax for the taxable year 1977 and an addition to tax of $762 under section 6651(a)(1)[1] for late filing of petitioner's return for that year. The issues for decision are (1) how a sign-on bonus paid by a domestic professional sports club to a nonresident alien should be allocated to sources within and without the United States, (2) whether certain business expenses are deductible, and (3) whether petitioner had reasonable cause for failure to file a timely return.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner was a citizen and resident of Canada during the taxable year 1977 and resided in Canada at the time the petition herein was filed. He filed a cash-basis, nonresident alien Federal income tax return on June 22, 1978, with the Brookhaven Service Center, Holtsville, N.Y.

At the beginning of 1977, petitioner was an 18-year-old amateur hockey player purportedly under contract to play hockey for the Kingston Canadians (Canadians) of the Canadian Major Junior Hockey League. Such contract ran through the 1977–78 hockey season and contained a promise by petitioner "to play hockey only for the Club [Canadians]."[2]

Petitioner desired to play professional hockey. However, both of the premier professional North American hockey leagues, the National Hockey League (NHL) and the World

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year at issue, and all Rule references are to the Rules of Practice and Procedure of this Court.

[2]This "contract" was entered into between petitioner and the Canadians in 1975 when petitioner was 17 years old. Petitioner believed in 1977 that the "contract" was unenforceable due to his minority status. Pursuant to the contract, petitioner received a salary of $75 per week for each week of the season, including playoffs.

Hockey Association (WHA),[3] had rules prohibiting clubs from drafting and signing players who would not become 20 years old during the calendar year ("the 20-year-old rule"). Consequently, petitioner was not eligible to be drafted by an NHL or WHA team until 1978.

Robert C. Kaminsky (Kaminsky), a well-known hockey agent (and an attorney) was hired by petitioner in the fall of 1976 to represent him in his future dealings with professional hockey clubs. In January 1977, John Bassett, the owner of the WHA's Birmingham Bulls (Bulls) told Kaminsky that he was very interested in signing petitioner even though petitioner was 18 years old and therefore ineligible to be drafted under the WHA's existing rules. Bassett's original offer for petitioner was a $40,000 signing bonus and $40,000 salary per year for 2 years. Kaminsky informed Bassett that $40,000 was an insufficient sign-on bonus for a player of petitioner's caliber, and, after much negotiating, the sign-on bonus was increased to $75,000.

On February 15, 1977, petitioner entered into an agreement (the sign-on agreement) with the Bulls which provided as follows:

WHEREAS, the club wishes to enter into a contractual relationship with Player in order to engage his services;

AND, WHEREAS, Player is a highly skilled athlete, and is currently under no contractual commitment to a professional hockey team and is therefore a free agent, and maintains his amateur status;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH THAT:

1. Player will relinquish both his "free agent" and amateur status and enter into an agreement with Club.

2. As consideration for Player accomplishing the above, Club shall pay Player the sum of Sixty-Five Thousand Dollars ($65,000), to be paid on or before June 3, 1977.[4]

---

[3]During the 1976–77 and 1977–78 hockey seasons, the NHL was composed of 18 teams, of which 3 were located in Canada. At the beginning of the 1976–77 season, the WHA had 11 teams, of which 3 were located in Canada. However, the Minnesota franchise f lded in mid-season and the Phoenix and San Diego franchises folded in post-season. Consequently, the 1977–78 WHA season began with eight teams, including three in Canada. After the season, the Houston franchise was merged into Winnipeg; the Indianapolis franchise folded in December of the 1978–79 season. The two leagues merged in 1979.

[4]An Addendum A to the contract, signed the same day, see page 517 *infra*, provided that $10,000 would be paid to Kaminsky as a partial fee payment for negotiating and drafting the agreement. The parties have treated this $10,000 fee as part of the sign-on bonus, and we will do likewise. The record does not reveal when the fee was paid.

The sign-on bonus was nonrefundable.

Petitioner received $59,667 during the taxable year 1977 pursuant to the sign-on agreement.

Also on February 15, 1977,[5] petitioner signed a standard World Hockey Association player's contract (player's contract) to play hockey for the Bulls during the 1977–78 through 1982–83 seasons.[6] In that agreement, petitioner promised "to play hockey only for the Club [Bulls]," with exceptions not relevant to the instant case.

Petitioner and the Bulls anticipated that the Kingston Canadians would object to petitioner's signing with the Bulls. One reason that the Canadians would object was that the NHL had an established policy of paying junior clubs from which it signed players a development fee of $40,000 and the WHA Bulls had no such policy. Consequently, the parties provided in Addendum A to the player's contract that—

II. Player agrees to pay, at his sole option, the sum of Five Thousand Dollars ($5,000.00) to the Canadian Major Junior Hockey League club (hereafter referred to as the "junior club") for which he has participated, the Kingston Canadians (Kingston Frontenac Hockey Limited). However, if Player is required, by judgment of a duly constituted court of law in the United States or Canada, that he must pay a sum in excess of Five Thousand Dollars to the aforementioned junior club as a "development fee," or if said junior club obtains any judgment against him in said duly constituted court of law in excess of Five Thousand Dollars ($5,000), Club agrees to indemnify and hold Player harmless against such judgment to the extent it exceeds Five Thousand Dollars.[7]

On June 16, 1977, the Bulls selected petitioner in the WHA 1977 amateur draft. The WHA informed the Bulls the next day that their selection was null and void due to the "20-year-

---

[5]The parties have stipulated to this date, although the stipulated copy of the basic contract shows an Apr. 15, 1977, date, with Addendum A bearing a date of Feb. 15, 1977. Since this difference appears not to be relevant, we will abide by the stipulation of the parties.

[6]The contract provided for a base salary for each year as follows:

| | |
|---|---|
| 1977–78 | $50,000 |
| 1978–79 | 50,000 |
| 1979–80 | 65,000 |
| 1980–81 | 80,000 |
| 1981–82 | 90,000 |
| 1982–83 | 100,000 |

An incentive bonus (player performance) system was included in the addendum to the contract.

[7]The Bulls also agreed to pay "all legal fees and costs to Player in connection with defending against a lawsuit arising out of his entering into this Agreement."

old rule." Petitioner then sued the WHA. In *Linseman v. World Hockey Association*, 439 F. Supp. 1315 (D. Conn. 1977), the "20-year-old rule" was held invalid under the Sherman Antitrust Act. As a result, petitioner played hockey for the Bulls during the 1977–78 season. Of the 86 scheduled Bulls games, 16 were in Canada and the balance in the United States.

Performance by petitioner under the Kingston player's contract would have taken place entirely in Canada.

Petitioner was never required to pay, nor in fact did he pay, any amount to Kingston.

Of the $2,305 in unreimbursed business expenses deducted by petitioner on his 1977 return and disallowed by respondent as unsubstantiated, a total of $645 (consisting of $270 "fines" expenses, $350 for professional association dues, and $25 for telephone expense) constituted ordinary and necessary business expenses of petitioner.

OPINION

The principal issue involved herein is the proper allocation of the $75,000 sign-on bonus between income from sources within the United States and income from sources without the United States.[8] Secs. 861, 862, and 863. At the outset, we note that neither party contends (correctly, we believe, since the bonus was nonrefundable) that the sign-on bonus should be treated as compensation for the services petitioner was expected to render by playing hockey for the Bulls. Cf. *Allen v. Commissioner*, 50 T.C. 466, 475–476 (1968), affd. per curiam 410 F.2d 398 (3d Cir. 1969). See Rev. Rul. 74–108, 1974–1 C.B. 248. Petitioner contends that $40,000 of the $75,000 was paid to him for use to obtain release of any liability for possible breach of his contract with the Canadians and that, since performance of that contract would have taken place entirely in Canada, the $40,000 is properly allocable to sources without the United States. On this basis, petitioner argues that the 50/

---

[8]Although the sign-on bonus was $75,000, the amount thereof received by petitioner in 1977 was $59,667, and it is the allocation of this amount which is the subject of dispute herein. By amended answer, respondent contended that the amount allocable to sources within the United States should be taxable at 30 percent rather than 15 percent (see sec. 871), but at trial respondent conceded that the 15-percent rate applied by virtue of art. XI of the Convention and Protocol between the United States of America and Canada Respecting Double Taxation.

50 allocation made by him on his 1977 return was reasonable and should be sustained. Respondent contends that the sign-on bonus constitutes compensation "for a promise by the petitioner to sign a playing contract" and thereby agree "to provide services to the Birmingham Bulls." On this basis, respondent, relying on Rev. Rul. 74–108, *supra*, argues that petitioner's allocation was unreasonable and that therefore the entire sign-on bonus should be allocated to the United States. Alternatively, respondent argues that it would be reasonable to allocate the sign-on bonus on the basis of the number of games played by the Bulls within and without the United States, i.e., in Canada, during the 1977–78 season. For the reasons hereinafter set forth, we agree with respondent's alternative position.

We deal first with petitioner's contention that $40,000 of the sign-on bonus should be allocated to Canada because that amount was to be used by him to obtain release from any potential liability for breach of the Kingston player's contract (which we note was never in fact paid) and that performance of such contract would have taken place entirely in Canada.[9] We hold that petitioner has not carried his burden of proof with respect to his contention (Rule 142(a)) that such an allocation was reasonable.

On its face, the sign-on agreement provides for no earmarking of the sign-on bonus. Similarly, the addendum to the player's contract, which appears to have been executed on the same day as the sign-on agreement (see note 5 *supra*), contains no specific reference to any $40,000 amount. It does, however, contain a specific provision whereby the Bulls agree to hold petitioner harmless for any amount over $5,000 which petitioner might be required to pay Kingston as a result of a judgment by a duly constituted court of law in the United States or Canada. See page 517 *supra*. While Kaminsky, who conducted the negotiations with the Bulls on petitioner's behalf and who prepared the sign-on agreement and the player's contract, testified that the possibility of petitioner's liability to Kingston was actively considered, that such liabili-

---

[9]Petitioner also contends that part of the sign-on bonus was to compensate him for: (1) Giving up his free-agent status; (2) possibly being blackballed from professional hockey for violating the "20-year-old rule"; (3) becoming a "cause celebre" against his wishes; (4) giving up the opportunity to continue his education.

ty was the subject of discussions with Kingston, and that petitioner offered Kingston $40,000, which was refused, it appears that all discussions with Kingston occurred well after the sign-on agreement and player's contract were finalized. Similarly, if the consideration of such liability to the extent of $40,000 was an element of the negotiations culminating in the sign-on agreement and the player's contract, it is difficult to understand why those documents contained no reference to that amount. In fact, those documents can be construed as imposing on the Bulls both the obligation to pay the sign-on bonus *and* an obligation to indemnify petitioner to the extent that he was required to pay Kingston an amount in excess of $5,000. Moreover, Kaminsky's testimony that the sign-on bonus was increased from $40,000 to $75,000 "in order [to have] money to pay off Kingston if necessary" is inconsistent with his testimony that he told Bassett that the original offer of a $40,000 bonus (and $40,000 a year to play hockey for 2 years)—

would not be sufficient for a player of Mr. Linseman's caliber. He was considered one of the very best junior eighteen year old hockey players in North America. * * * he was worth more than that.

We are not prepared to believe, as petitioner would apparently have us do, that, even though petitioner was "worth" a great deal more than Bassett had offered, the extra $35,000 increase in the sign-on bonus (and $5,000 of the original $40,000 bonus) was "earmarked" for Kingston. While petitioner's potential problem with Kingston was certainly one factor that had to be considered in determining what it would take to induce petitioner to sign with the Bulls, we hold that it was unreasonable to allocate half of a $75,000 signing bonus to this element.[10]

We disagree with respondent, however, that the fact that petitioner's allocation is held to be unreasonable in and of itself requires us to hold that no allocation is permissible. The fact that respondent may so provide in Rev. Rul. 74–108, *supra*, is not binding upon us. E.g., *Stubbs, Overbeck &*

---

[10]We note that the record suggests that petitioner might have been able to avoid any liability on the ground that he was a minor at the time he executed the Kingston player's contract. Perhaps this is why Kingston never sought damages from petitioner.

*Associates v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971).

If the sign-on bonus is not treated as being specifically allocated to petitioner's potential liability to Kingston, it is to be allocated under regulations prescribed by the Secretary of the Treasury. Sec. 863. Neither section 861, section 862, nor the regulations specifically provide for allocation of such an item. Thus, a method of allocation must be constructed. This respondent has done by virtue of Rev. Rul. 74–108, *supra*. In that Revenue Ruling, respondent (properly, we think) says that the allocation "must be reasonable and based on the facts and circumstances in each case." It is to that question that we now turn our attention.

Resolution of this question involves an analysis of the nature of a sign-on bonus. If, as respondent suggests in Rev. Rul. 74–108, *supra*, and in the instant case, the sign-on bonus is essentially a payment for a covenant not to compete and its locus is where the taxpayer forfeits his right to act, the further question is posed as to where that forfeiture takes place. If the covenant not to compete is worldwide, it can be argued that, at least in theory, the taxpayer forfeits his right to act in any place where he might otherwise act. On a worldwide basis, that forfeiture would seem to occur wherever the activity (in this case hockey) is played or, indeed, might be played. The required analysis thus becomes exceedingly complex.[11] See Dailey, "The Concept of the Source of Income," 15 Tax L. Rev. 415, 442–443 (1960). See also *Stemkowski v. Commissioner*, 76 T.C. 252, 297–299 (1981), modified 690 F.2d 40 (2d Cir. 1982), discussing *Korfund Co. v. Commissioner*, 1 T.C. 1180, 1184–1187 (1943).

It seems to us that, irrespective of any theoretical considerations as to the nature of a sign-on bonus, the primary purpose for such a bonus is to induce the player to sign a contract to play with the bonus-paying club.[12] The reality of this approach

---

[11]For example, in the instant case, would we look only to games played by WHA teams or to such games together with games played by teams in the rival NHL or would we include minor-league hockey and/or European hockey as well? When determining how many games were played by WHA teams other than the Bulls, would we consider the franchises that folded after petitioner entered into the sign-on agreement but before the start of the 1977–78 season? See note 3 *supra*. Would we consider the franchises that folded later? If a Swedish player were induced to leave his native country to play in the NHL, would we consider all the professional teams in Sweden?

[12]Concededly, there may be other incidental purposes for the sign-on bonus. Thus, petitioner herein recognizes that part of his sign-on bonus ($35,000 by his computation) should be allocated to

is clear in the instant case, where the sign-on agreement provided that petitioner "will * * * enter into an agreement with Club [Bulls]" (see page 516 *supra*), and petitioner did in fact enter into such an agreement. However, in pointing to this fact, we are not suggesting that we would necessarily reach a different conclusion had the sign-on agreement not contained the above language or been limited to a promise not to play hockey for anyone else.[13] Whatever the specifics of the sign-on agreement, the fact remains that the underlying purpose of such an agreement is to induce the player to perform the affirmative act of playing. It is that act which puts flesh on the bones of the sign-on agreement.

The long and the short of the matter is that we think the most reasonable allocation of the sign-on bonus herein is on the basis of the number of games the Bulls contemplated playing within and without the United States during the regular 1977–78 season.[14] The fact that the sign-on bonus is not itself compensation for service (see page 518 *supra*) does not preclude us from using the places where the contemplated services were to be performed as the basis for allocation.[15]

---

the other claimed reasons for paying the sign-on bonus. See note 9 *supra*. Petitioner suggests, in order to support the argument that his allocation of $40,000 to Canada was reasonable, that even part of the activities reflected by such reasons could take place in Canada, but he made no attempt to prove how much such an additional allocation would involve. In point of fact, an allocation of these elements would be so ephemeral as to be incapable of adequate proof. Thus, for example, petitioner appears to have had both an American and a Canadian lawyer and he could have gone to college either in the United States or Canada or, in fact, elsewhere outside the United States.

[13]Again, theoretically the promise to "enter into an agreement" could be construed as having been intended only as a covenant not to compete. We doubt, however, that any club would offer a sign-on bonus *solely* to keep a player from playing elsewhere. Even if this possibility existed, it would presumably be intended only to prevent the player from playing with a rival team, i.e., a team that played in the United States and Canada.

[14]Neither party argues that we should not consider any portion of the season after Dec. 31, 1977 (see Harwood, "Recent CA-2 Decision Focuses on Computing U.S. Source Income for Nonresident Alien," 58 J. of Tax. 266 (1983)), or that we should take into account the number of games the Bulls would play during the entire six seasons covered by the Birmingham player's contract. Nor has either party argued that potential playoff games or periods of training should be taken into account, and we express no opinion as to the validity of any such contention. Compare *Stemkowski v. Commissioner*, 690 F.2d 40 (2d Cir. 1982), modifying 76 T.C. 252 (1981). Nor have we any occasion herein to deal with any other bases for allocation. See Rev. Rul. 74–108, 1974–1 C.B. 248, 249.

[15]In *Stemkowski v. Commissioner*, 76 T.C. 252 (1981), and 690 F.2d 40 (2d Cir. 1982), this Court and the Court of Appeals allocated compensation for services for the taxable year 1971 on a time basis in accordance with sec. 1.861–4(b), Income Tax Regs., as then in effect. The provisions of sec. 1.861–4(b), Income Tax Regs., applicable to the taxable year 1977 set forth alternative methods of allocation depending on the facts and circumstances. Thus, the method of allocation adopted herein with respect to the sign-on bonus is clearly within the ambit of the regulation. See also Rev. Rul. 74–108, *supra*.

With respect to the disallowed business expenses, our findings of fact confirm our holding from the bench during the course of the trial.[16] See page 518 *supra*.

As to the addition to tax under section 6651(a) for untimely filing of petitioner's 1977 tax return, we hold that petitioner has failed to carry his burden of proof. Rule 142(a). The mere fact that petitioner thought that, because of the method of allocation he adopted, he owed no tax is not sufficient to excuse his failure timely to file a return.

*Decision will be entered under Rule 155.*

---

[16]Respondent has made no contention that these expenses should be allocated between income from sources within and without the United States.