JOHN F. KNOWLTON AND BETTY W. KNOWLTON,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 22639–81    Filed February 6, 1985.
(Non-Nitrol Issues).

*Herbert L. Camp*, for the petitioners.
*Robert W. West* and *Jillena A. Warner*, for the respondent.

## OPINION

TANNENWALD, *Judge*: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years ending December 31, 1977, and December 31, 1978, of $61,924 and $63,281, respectively. In his answer, respondent asserted an increased deficiency for 1978 of $10,451. These deficiencies concern the "Nitrol issues" arising from respondent's adjustments to petitioners' Schedules C, and were the subject of a trial held before Judge Nims on December 12, 1983. In his amended answer, respondent alleged an additional increased deficiency for 1978 of $585,034.66, all of which concerns the treatment of stock received in a corporate liquidation (the "non-Nitrol issue"). By orders of December 5, 1983, and March 20, 1984, the Court granted the parties' joint motion to sever the Nitrol and non-Nitrol issues for purposes of trial, briefing, and opinion. The non-Nitrol issue, the sole subject of this opinion, was submitted to the Court fully stipulated pursuant to Rule 122[1] on December 12, 1983. The only issue for our decision is whether certain stock distributed to petitioner

[1]Unless otherwise indicated, all Rule references are to the Rules of Practice and Procedure of this Court, and all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.

Betty W. Knowlton[2] during taxable year 1978 in liquidation of a corporation of which she was a shareholder was "acquired by the corporation after December 31, 1953" within the meaning of section 333(e)(2).

The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in St. Petersburg, Florida. Petitioners filed a joint tax return for 1978.

Prior to June 1978, petitioner owned 975 shares of nonvoting common stock in the Dunmovin Corp. (Dunmovin), a personal holding company having its principal place of business in Dover, Delaware. Dunmovin was liquidated during June 1978 pursuant to section 333, and petitioner was a "qualified electing shareholder" of Dunmovin within the meaning of section 333(c). Petitioner received from Dunmovin a liquidating distribution of $75,723.59 in cash and $5,795,740.02 in marketable securities (at fair market value). Included in the distribution of marketable securities to petitioner were 24,950 shares of common stock in General Motors Corp. (the GM stock or shares).

Dunmovin had received the GM stock from E.I. duPont de Nemours & Co. (duPont) during the taxable years 1962, 1964, and 1965 as a result of the divestiture order by the U.S. Supreme Court in the antitrust decisions in *United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586 (1957), 366 U.S. 316 (1961). Dunmovin, a passive shareholder of duPont, had no role in the management of duPont, was not a party to the antitrust litigation resulting in duPont's distribution of the GM stock, and did not initiate, consent to, or approve the distribution. Dunmovin acquired the duPont stock with respect to which it received the antitrust distribution prior to 1954, and duPont acquired the GM stock prior to 1954. DuPont was itself eligible to be liquidated under section 333.

At the time duPont distributed the GM stock to Dunmovin, the distribution was taxed to Dunmovin as a dividend in the amount of the adjusted basis of the GM stock in the hands of duPont (see section 301(b)(1)(B)) and was eligible for the 85 percent dividends received deduction under section 243. Pursuant to section 301(d)(2), the adjusted basis of the GM stock in

---

[2]As the shares involved in the non-Nitrol issue were owned by petitioner Betty W. Knowlton, we will hereinafter refer to Mrs. Knowlton as petitioner and Mr. and Mrs. Knowlton as petitioners.

the hands of Dunmovin was carried over from that of duPont. Consequently, Dunmovin's holding period for the GM stock included the period duPont had held such stock. Sec. 1223(2).

The only point of contention between the parties is the legal issue of whether the GM stock, distributed to Dunmovin in 1962, 1964, and 1965 with respect to its duPont stock acquired before 1954, was "acquired" by Dunmovin "after December 31, 1953" within the meaning of section 333(e)(2).[3] If it was, then petitioners realized long-term capital gain for 1978 by virtue of the distribution of the GM shares. If, however, the shares were "acquired" by Dunmovin before 1954, the GM shares were properly excluded from petitioners' gain computation under section 333(e)(2).[4] Respondent contends that with minor exceptions, not applicable herein, the date stock or securities are "acquired" within the meaning of section 333(e)(2) is the date they are received. Petitioners contend that the date of acquisition within the meaning of section 333(e)(2) should relate back where there is a substitution of basis and a tacking of holding period with respect to the stock or securities acquired[5] or where they have been acquired involuntarily.

The issue is a narrow one, i.e., the meaning of the word "acquired" in section 333(e)(2), and, aside from interpretative rulings by respondent hereinafter discussed (see *infra* pp. 165–168, the case is one of first impression. For the reasons hereinafter set forth, we hold for respondent.

The Supreme Court in *Commissioner v. Brown*, 380 U.S. 563 (1965), set forth the guidelines for our decision. The Court

---

[3]Sec. 333(e) provides as follows for noncorporate shareholders receiving a liquidating distribution under sec. 333—

(1) there shall be recognized, and treated as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subsection (a)(2), but without diminution by reason of distributions made during such month; but by including in the computation thereof all amounts accrued up to the date on which the transfer of all the property under the liquidation is completed; and

(2) there shall be recognized, and treated as short-term or long-term capital gain, as the case may be, so much of the remainder of the gain as is not in excess of the amount by which the value of that portion of the assets received by him which consists of money, or of stock or securities acquired by the corporation after December 31, 1953, exceeds his ratable share of such earnings and profits.

[4]The parties have stipulated all the necessary elements to calculate petitioners' long-term capital gain, if the GM stock was "acquired [by Dunmovin] after December 31, 1953."

[5]There is no dispute between the parties that the basis and holding period of the GM stock acquired by Dunmovin is computed by reference to the basis and date of acquisition thereof by duPont.

pointed out, on the one hand, that the "common and ordinary meaning [of a word] should at least be persuasive of its meaning as used in the Internal Revenue Code," but, on the other hand, that the courts have some leeway in interpreting a statute if the adoption of a literal or usual meaning of its words "would lead to absurd results * * * or would thwart the obvious purpose of the statute." See 380 U.S. at 571 (quoting *Helvering v. Hammel*, 311 U.S. 504, 510–511 (1941)).

Turning to the first guideline, it seems to us that, in common parlance, one cannot be said to "acquire" property before one obtains ownership, possession, or control over it. Applying this standard, it seems clear that Dunmovin did not "acquire" the GM stock until after December 31, 1953. We are reluctant, however, to go so far as to equate what we believe to be the common and ordinary meaning of the word "acquired" in section 333(e)(2) unqualifiedly with the "plain meaning" of that word. There may be situations where, as respondent himself has ruled, the "acquired" shares represent no more than a substitution for, or additional shares of the same type as, shares previously acquired. See Rev. Rul. 56–171, 1956–1 C.B. 179, discussed at p. 165 *infra*. Given our reluctance, we think there is room to examine the legislative history and policy which underlie the statutory provisions involved in the instant case. See, e.g., *Abdalla v. Commissioner*, 647 F.2d 487, 496–499 (5th Cir. 1981), affg. 69 T.C. 697 (1978).

Section 333(e)(2) was originally enacted in 1938, as a temporary relief measure designed to facilitate the liquidation of personal holding companies. Insofar as the instant case is concerned, the language utilized was the same as is presently contained in section 333(e)(2), except that the operative date with respect to stock or securities "acquired" (the "cutoff date") was April 9, 1938. See J. Seidman, Legislative History of Federal Income Tax Laws 1938–1861, at 49–52 (1938). The provision was reenacted as a temporary measure in 1943, 1950, and 1951 and was the subject of unsuccessful attempts at reenactment in 1942 and 1948. For the details of the various committee reports and comments on the floor of Congress, see I J. Seidman, Legislative History of Federal Income and Excess Profits Tax Laws 1953–1939, at 1541–1550 (1954). When the Internal Revenue Code was enacted, the temporary relief provision was made permanent in section 333 with a

cutoff date of December 31, 1953. For the legislative history, see S. Rept. 1622, 83d Cong., 2d Sess. 48, 256 (1954); Conf. Rept. 2543, 83d Cong., 2d Sess. 41 (1954). Our examination of the legislative history unfortunately reveals, with one possible exception, nothing which would cast light on any purpose behind these recurring legislative actions other than to continue to facilitate personal holding company liquidations. The exception, upon which petitioners seize to support their position, is the following statement in the 1950 Senate Finance Committee Report: "To avoid conversion of the assets of the corporation into stock or securities which could be distributed tax-free in anticipation of legislative action restoring section 112(b)(7) [of the 1939 Internal Revenue Code], the basic [cutoff] date * * * is made August 15, 1950, the date when this legislation was approved by your committee." S. Rept. 2375, 81st Cong., 2d Sess. 63 (1950). We think this language does no more than to exhibit legislative concern with an obvious means of tax avoidance which, if not covered, could frustrate the requirement of section 333 that a stockholder's gain be recognized to the extent of cash received. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 11.21, at 11–25 (4th ed. 1979). See also Rev. Rul. 76–392, 1976–2 C.B. 249; Burke, "Section 333 Liquidations—Boon or Bust?" 21 Baylor L. Rev. 185, 191 (1969). It cannot be transformed, as petitioners argue, into a legislative manifestation that transactions not involving such conversion were of no concern to the Congress and therefore should be exempted from the "acquired" condition of section 333(e)(2).

Similarly, we are not prepared to accept petitioners' argument that a 1969 amendment to section 333(e) indicates a legislative policy to exempt transactions of the type involved herein. Section 917 of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 724 (1969), provided that stock or securities distributed by a corporation liquidating during 1970 would be treated as having been "acquired" by the corporation before January 1, 1954, if they were acquired from a limited class of persons solely for stock of the corporation in a section 351 transaction, and the holding period of such stock or securities included a period before January 1, 1954. What little legislative history there is reveals that the amendment was intended to cover one particular holding company in the State of

Washington (see 115 Cong. Rec. S16385 (daily ed., Dec. 10, 1969) (remarks of Senator Bennett)), and that the Congress assumed that a correct interpretation of the "acquired" condition of section 333(e)(2) necessitated remedial legislation to provide the desired limited exception.[6] See Staff of Joint Comm. on Taxation, 91st Cong., 1st Sess., General Explanation of the Tax Reform Act of 1969, at 253 (Comm. Print 1970); H. Rept. 91–782, at 337 (1969). Here again, we think petitioners distill too much from what is at best a meager reflection of legislative purpose.

Thus, the legislative history of section 333(e)(2) is not particularly helpful in pointing the way to decision in the instant case. One other tool is available to us, namely, the manner in which respondent, as the Commissioner of the agency responsible for the administration of the revenue laws, has interpreted the "acquired" condition of section 333(e)(2). While respondent's rulings are not binding upon us (*Dixon v. United States*, 381 U.S. 68, 74–75 (1965); *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971); *Linseman v. Commissioner*, 82 T.C. 514, 520 (1984)), we are entitled to utilize such rulings as an aid to interpretation. *Hanover Bank v. Commissioner*, 369 U.S. 672, 686–687 (1962); *Union Carbide Corp. v. Commissioner*, 75 T.C. 220, 247–248 (1980), affd. per curiam 671 F.2d 67 (2d Cir. 1981). In his first interpretation of section 333(e)(2), Rev. Rul. 56–171, 1956–1 C.B. 179, respondent considered stock received by a corporate shareholder in a statutory merger qualifying under section 368(a)(1)(A). For purposes of the subsequent liquidation of the corporate shareholder, respondent ruled that the stock was "acquired," within the meaning of section 333(e)(2), as of the date the corporate shareholder acquired the stock in exchange for which it received the stock being distributed. Thus, respondent, without explanation, allowed the corporation to relate its post-1953 acquisition back to a date before 1954.

In Rev. Rul. 58–92, 1958–1 C.B. 174, respondent treated stock and securities received from an individual shareholder in a section 351 transaction differently. Noting that the

---

[6]Although the legislative history makes no reference to how respondent had applied sec. 333(e)(2) when there had been a prior sec. 351 exchange, the fact of the matter is that respondent had interpreted the "acquired" condition with what appears to have been the assumption underlying sec. 917 of the Tax Reform Act of 1969. Rev. Rul. 56–171, 1956–1 C.B. 179.

liquidating corporation had taken the stock and securities with a carryover basis and holding period from the contributing shareholder, respondent nevertheless treated the transfer as a purchase with contributed cash, and found that the stock was "acquired" on the date of receipt from the shareholder. Respondent stated a general rule that stock and securities will be treated as cash equivalents for purposes of section 333 (i.e., there will be no relation back of the "acquired" date) unless they were owned by an existing corporation on December 31, 1953, or "received, with respect to stock or securities owned on that date, in a nontaxable exchange pursuant to a plan of reorganization or as a nontaxable stock dividend." Respondent reasoned that reorganizations and stock dividends were not section 333(e)(2) "acquisitions," but were instead "merely changes in the nature or form of stock already owned by the liquidating corporation." As the stock and securities were transferred by an individual after December 31, 1953, to a newly formed corporation which was not in existence on that date, respondent refused to relate the acquisition back to the individual shareholder's acquisition date.[7]

In Rev. Rul. 64–257, 1964–2 C.B. 91, respondent ruled that the "acquired" date was the date of receipt in a situation in which a liquidating corporation had received the distributed stock from a *foreign* predecessor corporation in a nontaxable reorganization. Noting that the reorganization did not involve an exchange of stock held on December 31, 1953, for the new stock, respondent distinguished Rev. Rul. 56–171, *supra*, on the basis that stock or securities held by a corporation itself unable to qualify for section 333 treatment are not owned by an "existing corporation" for purposes of the rule set forth in Rev. Rul. 58-92, *supra*.[8]

We are unpersuaded by petitioners' contention that respondent's rulings support their position. They point to Rev. Rul 64–257, *supra*, and argue that since that ruling was grounded

---

[7]See discussion, pp. 164–165 *supra*, of the limited exception governing a sec. 351 transaction, which Congress enacted in the Tax Reform Act of 1969.

[8]In Rev. Rul. 78–350, 1978–2 C.B. 135, respondent took the same position as he takes herein with respect to what appears to be the same transaction, i.e., the distribution by a personal holding company in sec. 333 liquidation of stock received by the liquidating corporation as a result of an antitrust divestiture decree. Since that revenue ruling reflects little more than a reliance on Rev. Rul. 58–92, 1958–1 C.B. 174, and cursorily distinguishes Rev. Rul. 56–171, *supra*, and since respondent disclaims any reliance thereon, we find it unnecessary to consider what weight, if any, we should accord to it. See *Ludwig v. Commissioner*, 68 T.C. 979, 985–986 n. 4 (1977).

on the fact that the distributed stock was acquired in a nontaxable exchange from a foreign corporation ineligible to qualify for the benefits of section 333, and duPont was an eligible domestic corporation, ergo the inference to be drawn from the revenue ruling is that the transaction herein qualifies. Petitioners' logic is flawed because it does not necessarily follow from the fact that (1) if condition A exists, consequence B results, that (2) if condition A does not exist, consequence B will not result. See I. Copi, Introduction to Logic 234 (4th ed. 1972). Moreover, we note that the GM stock was not acquired by Dunmovin in a nontaxable exchange but rather in a taxable transaction, where no exchange was involved. See *infra* p. 168. Dunmovin received the GM stock, and its previous holding in duPont was now changed into a holding of duPont *and* GM shares, a holding quite different from that which would have obtained if duPont had issued a dividend in its own stock, i.e., a true stock dividend.

We are also unpersuaded that petitioners can draw any sustenance from G.C.M. 36743, which was directed to a proposed ruling by respondent which became Rev. Rul. 76–392, 1976–2 C.B. 249, dealing with the meaning of the word "acquisition" in section 1236(a)(1). Petitioners contend that the language of G.C.M. 36743 imports a "voluntariness" test into section 333(e)(2).[9] But the fact of the matter is that Rev. Rul. 76–392, *supra*, did not adopt the language of G.C.M. 36743, but instead utilized the cash conversion concept to explain the "acquired" condition of section 333(e)(2).[10] Moreover, respondent has disallowed relation back of the "acquired" date even where no cash was apparently exchanged in the transaction in which the liquidating corporation received the distributed

---

[9]The relevant language in G.C.M. 36743 is as follows—

"the objective of Code sec. 333(f)(1) [the corporate shareholders' counterpart to sec. 333(e)(2)] is to prohibit the voluntary conversion of cash into securities in anticipation of a liquidating distribution in an attempt to defer recognition of gain at the shareholder level. Where the investment is not initiated by the liquidating corporation for these reasons, the objectives of Code sec. 333 do not demand treating the receipt of the security as an acquisition. Thus, Rev. Rul. 56–171 concludes that the receipt of shares pursuant to a tax-free statutory merger does not constitute an acquisition * * * since the transaction is a mere change in the nature of the security held, neither voluntarily undertaken or initiated by the liquidating corporation nor designed to convert cash into distributable property."

[10]Rev. Rul. 76–392 states: "This 'after acquired' stock is treated the same as cash to prevent the liquidating corporation from converting cash into stock or securities in an attempt to defer recognition of gain at the shareholder level." Rev. Rul. 76–392, 1976–2 C.B. 249. No further explanation of Rev. Rul. 56–171, *supra*, appears therein.

shares. Rev. Rul. 64–257, *supra* (stock acquired from foreign predecessor corporation in section 368(a)(1) exchange).

Petitioners further contend that the distribution of GM stock from duPont to Dunmovin was a nontaxable transaction and thus fits within the ambit of Rev. Rul. 58–92, *supra*, which holds that the date on which stock received as the result of a statutory merger or by way of a stock dividend was "acquired" within the meaning of section 333(e)(2) is a date earlier than the date of actual receipt. While it is true that sections 243, 301(b)(1)(B) and (d)(2), and 1223(2) combine to give the transfer of the GM stock a partially nontaxable status, it is clear that whether the transaction is taxable and whether the transferee receives a carryover basis and holding period are not determinative. In both Rev. Rul. 58–92 and Rev. Rul. 64–257, *supra*, involving transactions at least as tax advantaged as Dunmovin's receipt of the GM stock, respondent, stating that the transaction's nontaxable quality and carryover holding period were immaterial, refused to relate back to the "acquired" date. Instead, respondent relied on the distinction between acquisitions and mere changes in the form of previously owned assets. Thus, petitioners' assertion that respondent's rulings stand for the proposition that all tax-advantaged transactions qualify for favorable treatment under section 333 is simply not true.

Finally, we turn to petitioners' ultimate position, namely, that the acquisition by Dunmovin of the GM stock was involuntary and that therefore petitioners should not be penalized as a result of the liquidation of Dunmovin. In support of this position, petitioners argue that section 1111 (Pub. L. 87–403, 76 Stat. 4 (1962), repealed by Pub. L. 94–455, sec. 1901(a)(134), 90 Stat. 1786 (1976)) reflects a legislative policy to aid individual shareholders affected by the involuntary acquisition of General Motors shares pursuant to the distribution resulting from the duPont divestiture, and that this policy should be a guideline for interpreting the "acquired" condition of section 333(e)(2). Petitioners' argument is flawed in several respects. First, there is not the slightest indication in the legislative history of section 1111 that Congress even considered the interrelationship between that section and section 333. Such silence stands in sharp contrast to the numerous other sections of the Code which Congress took into account in enacting section 1111. H. Rept. 1157, 87th

Cong., 1st Sess. (1961); S. Rept. 1100, 87th Cong., 1st Sess. (1961); H. Rept. 1128, 86th Cong., 1st Sess. (1959). See *Commissioner v. Korell*, 339 U.S. 619, 625–626 (1950), where the Supreme Court emphasized the absence of any indication that Congress had considered a significant loophole in the applicable statutory provision. Second, it is clear from section 1111 and the accompanying legislative history that Congress deliberately conferred a benefit upon corporate shareholders, such as Dunmovin, by according them the 85 percent dividends received deduction rather than the return-of-capital treatment it bestowed upon individual shareholders. Thus, it cannot be said that individual shareholders were the primary beneficiaries of legislative largess—a largess from which Dunmovin has already benefited. Third, section 1111 dealt with a problem which, at most, peripherally affected the operation of section 333. To support legislative intent from the action of a subsequent Congress not directly affecting the particular statutory provision in question would far exceed the permissible bounds of statutory construction. *Penn Mutual Co. v. Lederer*, 252 U.S. 523, 535, 537–538 (1920); *Estate of Stoll v. Commissioner*, 38 T.C. 223, 246–247 (1962). Fourth, we think it significant that, in the final analysis, the adverse tax consequence which petitioners seek to avoid herein stemmed from a *voluntary* act, namely, the liquidation of Dunmovin. That petitioners find themselves unable to take advantage of an ancillary tax benefit is irrelevant. Cf. *Central Tablet Manufacturing Co. v. United States*, 417 U.S. 673 (1974), where the happenstance of a fire precluded the taxpayers from satisfying the requirements of section 337. Moreover, even where involuntary action has produced an adverse consequence to a taxpayer, the Supreme Court has not deemed such an event sufficient to cause a modification of the word "sale" in the statutory provisions dealing with capital gains and losses. *Helvering v. Hammel*, 311 U.S. 504 (1941).

The long and the short of the matter is that applying the guidelines articulated in *Commissioner v. Brown* (see *supra* p. 162–163), we see no basis for concluding that the "common and ordinary meaning" should not be accorded the word "acquired" in section 333(e)(2), because to do so "would lead to

absurd results * * * or would thwart [its] obvious purpose."
Accordingly,

*An order will be entered holding for
respondent on the severed non-Nitrol issue.*