THE EDNA LOUISE DUNN TRUST, MORGAN GUARANTY TRUST COMPANY, TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 32031-85. Filed April 17, 1986.

*M. Carr Ferguson*, for the petitioner.
*Kendall C. Jones*, for the respondent.

OPINION

TANNENWALD, *Judge*: Respondent determined a deficiency of $29.64 in petitioner's Federal income taxes for the taxable year ended May 31, 1984. The issue for decision is whether a portion of the stock distributed to petitioner pursuant to a reorganization and divestiture plan constituted "other property" under section 355(a)(3)(B).[1]

This case was submitted fully stipulated under Rule 122. This reference incorporates herein the stipulation of facts and attached exhibits. We will set forth only those highly detailed stipulated facts (or a summary thereof) as are necessary to an understanding and disposition of the issue involved herein.

Morgan Guaranty Trust Co. of New York, trustee of petitioner, maintained its offices in New York, New York, at the time the petition herein was filed. Petitioner timely filed its Federal income tax return for the taxable year ended May 31, 1984, with the Internal Revenue Service Center, Holtsville, New York.

Throughout its fiscal year ended May 31, 1984, petitioner owned 400 shares of common stock of American Telephone & Telegraph Co. (AT&T) a corporation organized and existing under the laws of the State of New York. Petitioner received, as of January 1, 1984, a distribution with respect to its AT&T stock of 40 shares of stock of each of American Information Technologies Corp., Bell Atlantic Corp., BellSouth Corp., NYNEX Corp., Pacific Telesis Group (PacTel Group), Southwestern Bell Corp., and U S West, Inc. (AT&T's seven regional holding companies (RHCs)). Petitioner did not include in its gross income on its Federal income tax return for the year in question any amount on account of the receipt of these shares of the RHCs.

Until January 1, 1984, AT&T was the common parent corporation of a group of corporations known as the Bell System, whose principal business was the furnishing of communications services and equipment. The group included 22 Bell operating companies (BOCs) which were direct or indirect subsidiaries of AT&T, Western Electric Co., Inc.,

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.

Bell Telephone Laboratories, Inc., and other companies. The BOCs provided various communications services within their respective geographic operating areas and with other operating areas. In addition to its function as a holding company for the group, AT&T was itself directly and continuously engaged in an active trade or business since 1885. Such business was conducted through its "Long Lines" division which provided interstate and international telecommunications service.

On August 24, 1982, a longstanding antitrust suit between AT&T and the U.S. Government was disposed of by a judicially approved agreement between the parties. *United States v. American Telephone & Telegraph Co.*, 552 F. Supp. 131 (D. D.C. 1982), affd. sub nom. *Maryland v. United States*, 460 U.S. 1001 (1983). Under the terms of that decision and its subsequent judicially approved implementation (see *infra* pp. 748-749), certain "local exchange" functions of the BOCs were to be placed in the aforementioned seven RHCs and AT&T was to divest itself of its holdings therein.

In an action unrelated to the antitrust suit, the Federal Communications Commission (FCC), on April 2, 1980, ordered that, on or before March 1, 1982, certain acts be taken to separate the functions of the BOCs. See *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, 77 F.C.C. 2d 384 (1980), as modified on reconsideration, 88 F.C.C. 2d 512 (1981), affd. sub nom. *Computer & Communications Industry Association v. FCC*, 693 F.2d 198 (D.C. Cir. 1982), cert. denied sub nom. *Louisiana Public Service Commission v. Federal Communications Commission*, 461 U.S. 938 (1983).

In 1980, AT&T owned all of the outstanding stock of the BOCs, with the exception of some minority shares held by unrelated third parties in the New England Telephone & Telegraph Co., the Mountain States Telephone & Telegraph Co., Pacific Northwest Bell Telephone Co., and the Pacific Telephone & Telegraph Co. (Pacific).

Various steps were taken to implement the FCC mandate and at the same time serve the business interests of the Bell system, of which only those steps relating to Pacific need to be described herein.

Under an agreement of merger, dated November 5, 1981, between AT&T, Pacific and Pacific Transition Corp. (Transition), a newly formed, wholly owned subsidiary of AT&T, Transition would merge into Pacific and Pacific voting stockholders (other than AT&T and dissenting shareholders) would receive .35 shares of AT&T common stock (and cash in lieu of fractional shares) in exchange for each share of Pacific common stock and $60 in cash for each share of Pacific 6-percent voting preferred stock. The outstanding Pacific common and 6-percent voting preferred stock would be canceled and the outstanding share of Pacific Transition Corp.(held by AT&T) would be converted into one share of Pacific common stock.

The merger was consummated on May 12, 1982. At that time, Pacific had 224,504,982 shares of voting common stock, 205,345,275 (91.5 percent) of which were owned by AT&T, 820,000 shares of 6-percent voting preferred stock, 640,957 (78.2 percent) of which were owned by AT&T, and 21,120,000 shares of nonvoting preferred stock, none of which were owned by AT&T. The balance of the voting stock was publicly held, and the nonvoting preferred stock was held by institutional investors. Because the nonvoting preferred stock remained outstanding after the merger, AT&T did not acquire control of Pacific within the meaning of section 368(c), and the merger therefore resulted in recognition of gain or loss to Pacific's common and voting preferred shareholders.

On February 19, 1982, AT&T announced that, to accomplish the divestiture, the 22 BOCs would be grouped into seven regions. A separate, independent holding company structure was established for each region. This structure was subsequently incorporated in the plan of reorganization filed by AT&T on December 16, 1982, and approved by the court in *United States v. Western Electric Co.*, 569 F. Supp. 1057 (D. D.C.), affd. sub nom. *California v. United States*, 464 U.S. 1013 (1983).

The plan of reorganization provided that the articles of incorporation of Pacific would be amended to convert the 1 outstanding share of Pacific voting common stock into 224,504,982 shares of voting common stock (the number of common shares outstanding prior to the merger), and to

modify the rights of the nonvoting preferred stock to entitle each share to one vote per share with cumulative voting for directors as authorized by California law. By this change, AT&T would acquire control of Pacific by means of a tax-free reorganization, and then PacTel Group would be in control of Pacific within the meaning of section 368(c) at divestiture.

On January 21, 1983, AT&T applied to the Internal Revenue Service (IRS) for rulings (the application) that, inter alia, the amendment to Pacific's articles of incorporation would be a reorganization within the meaning of section 368(a)(1)(E), and no gain or loss would be recognized by AT&T or by the preferred shareholders on the constructive exchange of their preferred stock. Under date of October 6, 1983, the IRS ruled that the amendment qualified as a reorganization within the meaning of section 368(a)(1)(E), and that no gain or loss would be recognized by Pacific, AT&T, or the preferred shareholders.

In accordance with the plan of reorganization, AT&T and its affiliates would transfer to each regional holding company, in exchange for the latter's voting stock, the stock of the appropriate BOCs and other assets. Among the assets to be transferred to the PacTel Group were 224,504,982 shares of Pacific voting common stock. Thereafter, AT&T would then distribute to its stockholders 1 share of stock in each of the seven regional holding companies for every 10 shares of AT&T stock owned by AT&T shareholders of record at the close of business on December 30, 1983. Fractional shares would not be issued but would be aggregated and sold and the cash proceeds distributed to the stockholders.

The January 21, 1983, application also asked for rulings that, inter alia, no gain or loss would be recognized on the transfers of the stock of the BOCs and other assets to the regional holding companies in exchange for stock and that no income, gain, or loss would be recognized by AT&T shareholders upon the receipt by them of the stock in the holding companies.

The IRS ruled that no gain or loss would be recognized on the transfer of stock of the BOCs and other property to the seven regional holding companies in exchange for their stock and that no income, gain, or loss would be recognized

by AT&T shareholders upon the receipt of the stock of the six regional holding companies other than PacTel Group. With respect to the latter, the IRS ruled that a portion of the PacTel Group stock was taxable to the AT&T shareholders. The IRS thereafter advised that this portion of the PacTel Group stock had a value at the time of distribution equal to $0.39 per share of AT&T stock and the parties have accepted that value for the purposes of this case.

Section 355(a)(1) allows a corporation to make a tax-free distribution of the stock of a controlled corporation (control being defined in section 355(a)(1)(D)(ii) by reference to section 368(c)) to its shareholders in a tax-free distribution, provided the active business requirement of section 355(b) is met and the transaction is deemed not to be merely a "device" to distribute tax free, earnings and profits which otherwise would be taxable as a dividend. There is no dispute between the parties that these conditions have been satisfied. The issue upon which they have parted company is whether the limitations of section 355(a)(3)(B) apply. That section provides for the taxation of part of the distribution as follows—

(B) STOCK ACQUIRED IN TAXABLE TRANSACTIONS WITHIN 5 YEARS TREATED AS BOOT.—For purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation *by reason of any transaction*—
   (i) which occurs within 5 years of the distribution of such stock, and
   (ii) in which gain or loss was recognized in whole or in part,
shall not be treated as stock of such controlled corporation, but as other property.

[Emphasis added.]

Section 356(b), in turn, provides that "the fair market value of such other property shall be treated as a distribution of property to which section 301 applies."

Petitioner concedes that, if AT&T had distributed the Pacific stock directly to its shareholders, the Pacific stock acquired in the merger would have been treated as "other property" under section 355(a)(3)(B), because the merger was a taxable transaction that took place within 5 years of the divestiture. Petitioner argues, however, that it was PacTel Group stock, not Pacific stock, which AT&T distrib-

uted to its shareholders. Since this stock was acquired in what respondent concedes was a tax-free exchange, petitioner argues that none of such stock can be categorized as "other property."

Respondent contends that petitioner's position is overly simplistic and that the language of section 355(a)(3)(B) is sufficiently broad to permit an interpretation which will be more accommodating to what he views as the legislative purpose behind the section's enactment, namely to preclude not only direct distributions of purchased interests in an active business but also indirect distributions of such interests emanating from a holding company structure. By way of amplification of his position, respondent argues that (1) we should treat a portion of the PacTel Group common stock as having been acquired via the prior taxable acquisition of Pacific stock with the result that the "by reason of any transaction" provision of section 355(a)(3)(B) is satisfied, or (2) in view of the overall statutory framework of section 355, Pacific, as part of the PacTel Group, falls within the ambit of the statutory phrase "controlled corporation" as that term is used in section 355(a)(3)(B). As a consequence, respondent concludes that such portion of PacTel stock as represents the fair market value of the Pacific stock (stipulated to be $0.39 per share of AT&T stock) constitutes "other property" and is taxable as a dividend.

A literal reading of section 355(a)(3)(B) appears to support petitioner's position. On its face, the statutory language is directed to the distribution "of *stock of a controlled corporation*, acquired by the distributing corporation by reason of any [taxable] transaction [occurring] within 5 years of the *distribution of such stock*." (Emphasis added.) As used in section 355(a)(1)(A), the term "controlled corporation" means a corporation which the distributing corporation "controls immediately before the distribution" within the meaning of section 368(c). Since AT&T did not own directly any stock of Pacific immediately before the distribution, and because the stock attribution rules of section 318 are not applicable to section 368(c),[2] it follows that,

[2]See *Stephens, Inc. v. United States*, 464 F.2d 53, 65 n. 12 (8th Cir. 1972); *Breech v. United States*, 439 F.2d 409, 411 (9th Cir. 1971); Berghash v. Commissioner, 43 T.C. 743, 757 (1965),

from a literal standpoint, Pacific was not a "controlled corporation" of AT&T for purposes of section 355(a)(3)(B).[3] On this basis, petitioner would prevail.

We think it appropriate, however, not simply to adhere to the literal meaning of section 355(a)(3)(B). It can be argued—as indeed respondent does herein—that the words of that section are sufficiently ambiguous to permit a resort to legislative history, an aspect of this case to which we now turn our attention.

The stock boot rule of section 355(a)(3)(B) made its first appearance in the Senate version of the Internal Revenue Code of 1954, H.R. 8300, 83d Cong., 2d Sess. (1954). Section 355(a)(3) in the amendments to the bill as reported by the Senate Finance Committee on page 122 (June 18, 1954) provided that—

stock of a controlled corporation acquired by the distributing corporation within 5 years of its distribution, *in a transaction* in which gain or loss was recognized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property. [Emphasis added.]

In commenting on the addition of this section, the Senate Finance Committee stated that—

For purposes of determining the taxable nature of part of the exchange or distribution, stock in a controlled corporation acquired by purchase within 5 years of its distribution is treated as "other property." Thus, for example, if a corporation has held a minority stock interest in a corporation for 5 years or more prior to the distribution and within such 5-year period purchases control of such corporation *only the stock so purchased* will be considered "other property" * * * [S. Rept. 1622, 83d Cong., 2d Sess. 267-68 (1954). Emphasis added.]

The Conference Committee modified this proposal, however, and explained the modification as follows—

in section 355(a)(3), the phrase *"by reason of any transaction which occurs within 5 years of the distribution of such stock"* has been inserted in lieu of the phrase "within 5 years of its distribution, *in a transaction.*" The effect of this change is to make certain that, in addition to treating stock of a controlled corporation purchased directly by the distributing corporation as "other property," similar treatment will be given *such stock* if it is purchased within 5 years through the use of a controlled

affd. 361 F.2d 257 (2d Cir. 1966); Rev. Rul. 56-613, 1956-2 C.B. 213; cf. *Insilco Corp. v. Commissioner*, 73 T.C. 589, 597-598 (1979), affd. without published opinion 659 F.2d 1059 (2d Cir. 1981).

[3]Compare sec. 355(b)(2)(A), discussed at p. 755 *infra.*

corporation or of a corporation which, prior to a "downstairs merger," was in control of the distributing corporation. For example, if the parent corporation has held 80 percent of the stock of an active subsidiary corporation for more than 5 years but purchases the remaining 20 percent of such stock within the 5-year period, and distributes all of the stock, gain or loss will not be recognized nor will dividend treatment be accorded the stock distributed to the extent of 80 percent. The 20 percent of the stock will be treated as "other property" for purposes of section 356. Similarly, under the amendment made, where such parent causes another subsidiary to acquire the 20 percent of the stock and *then itself acquires such stock* in a liquidation in which no gain or loss is recognized to such parent under section 332, or where the subsidiary having held 80 percent of the stock of its subsidiary for more than 5 years, acquires the 20 percent of the stock which has been purchased by the parent within the 5-year period through a nontaxable "downstairs" merger of the parent into the subsidiary, and all of *the stock is distributed,* such 20 percent of the stock will in either case be treated as "other property." [H. Rept. 2543, 83d Cong., 2d Sess. 38 (1954). Emphasis added.]

Thus, the "by reason of any transaction" language was added to prevent a distributing corporation from avoiding taxation by acquiring additional controlled corporation stock via a purchase by a related entity coupled with some type of tax-free combination. The focus of section 355(a)(3)(B) both before and after the change remained the same; on the *acquisition and distribution of stock of the controlled corporation,* not on the acquisition of stock of the underlying, active subsidiary which was *not actually distributed.*

This brings us to respondent's second argument, namely that the overall statutory framework of section 355 requires section 355(a)(3)(B) to be interpreted as focusing not merely on the stock of the controlled corporation being distributed, but on the actual operating subsidiary included in the spinoff. Respondent correctly points out that the statutory framework of section 355(b)(2)(A) "itself envisions situations where a holding company will be used as the distributing mechanism for an active subsidiary." It provides that a corporation will qualify as an "active business" if for the 5-year period ending on the date of distribution it has been—

engaged in the active conduct of a trade or business, *or substantially all of its assets consist of stock and securities of a corporation controlled by*

*it* (immediately after the distribution) which is so engaged, * * *
[Emphasis added.]

Thus, section 355(b)(2)(A) allows the distributing corporation to "look through" the controlled corporation to its underlying active subsidiary in order to satisfy the active business requirement. Similarly, to qualify as an active trade or business under section 355(b)(2)(D) during the 5 years prior to the distribution of stock, it must be established that—

control of a corporation which (at the time of acquisition of control) was conducting such trade or business—
    (i) was not acquired directly (or through one or more corporations) by another corporation * * *

Therefore, much like section 355(b)(2)(A), this section cuts through the form of the spinoff and focuses directly on the underlying active subsidiary when considering whether or not a corporation qualifies as an active trade or business.

From this legislative framework, respondent concludes that, since it is the activity of the underlying subsidiary that qualifies the spinoff as a tax-free section 355 distribution to begin with, it is only logical and consistent that for section 355(a)(3)(B) purposes, we must also focus on the underlying active subsidiary. Unfortunately for respondent, as we have already observed neither the words of section 355(a)(3)(B), nor its legislative history, support his conclusion. Furthermore, although respondent discusses at great length the congressional purpose behind the passage of the "active business" provisions of section 355(b), his attempts to explain why we should interpret section 355(a)(3)(B) in a similar light, so that these two sections are read in "symmetry," with a focus on the active subsidiary, are far from convincing. Absent a clearer statement of legislative intent that we should look through the stock of the controlled corporation, we find it difficult to make the analytical jump respondent asks of us. Cf. *Insilco Corp. v. Commissioner*, 73 T.C. 589, 597-598 (1979), affd. without published opinion 659 F.2d 1059 (2d Cir. 1981), and cases cited therein. In fact, in light of the clear and detailed statutory scheme of section 355(b), the conspicuous absence of similar language in section 355(a)(3)(B) suggests that Congress was not only aware of the claimed "inconsis-

tency," but intended just such a result.[4] Moreover, we have not overlooked the interpretative implications of the ·fact that, both in operative text and examples, respondent's regulations under section 355 have been for some 30 years, and are anticipated to continue to be, conspicuously silent in respect of transactions of the type involved herein.[5]

However, our inquiry is not over. While it appears that both the plain meaning of section 355(a)(3)(B), as well as its legislative history, support petitioner's position, we also recognize that—

the courts have some leeway in interpreting a statute if the adoption of a literal or usual meaning of its words "would lead to absurd results * * * or would thwart the obvious purpose of the statute." See 380 U.S. at 571 (quoting *Helvering v. Hammel*, 311 U.S. 504, 510-511 (1941)). [*Knowlton v. Commissioner*, 84 T.C. 160, 163 (1985) (quoting *Commissioner v. Brown*, 380 U.S. 563 (1965)).]

Or, to put it another way, we should not adopt a construction which would reflect a conclusion that Congress had "legislate[d] eccentrically." See *J.C. Penney Co. v. Commissioner*, 312 F.2d 65, 68 (2d Cir. 1962), affg. 37 T.C. 1013 (1962). We are satisfied that our reliance on the wording of the statute involved herein would not have any such deleterious consequences either in terms of section 355(a)(3)(B) specifically or section 355 generally.

To begin with, pursuant to the merger, AT&T issued 6,705,897 shares of its common stock, with a fair market value of $370,500,834, in exchange for the 19,159,707 publicly held shares of Pacific common stock, and paid $10,742,580 for the 179,043 publicly held shares of Pacific 6-percent voting preferred stock. Thus, over 97 percent of the consideration furnished by AT&T to acquire the Pacific stock consisted of newly issued shares of its own stock. Since the underlying purpose of section 355(a)(3)(B) is to prevent the conversion of excess, liquid funds, such as cash and marketable securities, into additional controlled corporation stock that can then be distributed tax free in a spin off, we fail to see how respondent can argue that the spin

---

[4]Moreover, Congress has proven itself quite capable of enacting stock-taint rules when it has desired to do so. See, e.g., sec. 306(c)(1)(B)(ii) in which the same Congress that enacted sec. 355(a)(3)(B) provided for an "inherited taint" rule with respect to preferred stock received in exchange for sec. 306 stock pursuant to a plan of reorganization.

[5]Sec. 1.355-2(f), Income Tax Regs., and sec. 1.355-2(f), Proposed Income Tax Regs.

off of PacTel Group stock in any way frustrated the "obvious purpose of the statute."

Furthermore, by spinning off PacTel Group stock, AT&T did not bail out earnings and profits and thus undermine the general statutory purpose of section 355, because the Pacific stock acquired from the minority shareholders pursuant to the merger has remained in corporate solution and has never passed into the hands of AT&T's shareholders. Although respondent argues that this is merely a form over substance argument because the benefit of the purchased interest in the Pacific stock was transferred to PacTel Group, and thus was indirectly distributed to AT&T's shareholders, we note that—

A dividend does *not* confer an economic benefit on its recipient. The distribution leaves the shareholder no richer, since his directly owned assets increase only by the same amount that the beneficial ownership of those assets represented by his stock interest diminishes. A dividend therefore is included in gross income not because it affects the shareholder's net worth (which is increased even by undistributed corporate profits), but because the distributed property no longer is in corporate solution. [Kingson, "The Deep Structure of Taxation: Dividend Distributions," 85 Yale L. J. 861, 863-864 (1976). Emphasis supplied.]

Thus, even assuming, arguendo, that the net worth of each shareholder increased as a result of the AT&T stock purchase,[6] the simple fact remains that this did not give rise to a taxable event because AT&T did not distribute the Pacific stock. A bailout, like a dividend, by definition requires a distribution out of corporate solution. This has not occurred.

That the Pacific stock which was acquired in a taxable transaction remained in corporate solution is most significant. It has caused us to focus on some of the problems which would arise if respondent's approach were adopted herein. For example, how would a future distribution of Pacific stock be treated? Another problem which would

---

[6]We note that AT&T's shareholders did not in fact benefit from the Pacific merger. While we recognize that the acquisition, on AT&T's books, resulted in an increase in total net assets and corporate net worth (because AT&T acquired the majority of the Pacific stock for newly issued shares instead of for cash or debt securities), this increase did not filter down to the existing AT&T shareholders. When a corporation issues new stock in exchange for adequate consideration, existing shareholders realize no increase in the value of their individual holdings, because although the overall net worth of the company rises, so does the number of shares outstanding.

arise, if respondent's approach were adopted, involves the necessity of determining the value of the "tainted" stock transferred in the later nontaxable exchange and allocating that value to the shares of stock acquired in that exchange which then become the subject of a section 355 distribution—a problem which we are not required to face herein because of the parties' agreement as to the value attributable to the purchased Pacific stock and allocable to the distributed PacTel stock. The problem is even more difficult when more than one class of stock of the controlled corporation is received by the distributing corporation in the nontaxable exchange. Beyond this, is a still further complication if respondent should carry his approach to its logical conclusion and, in a later case, should ask us to extend the view which he asks us to adopt herein to a purchase of stock of a subsidiary of a subsidiary of the controlled corporation within 5 years of a section 355 distribution.[7] Granted that the courts often deal with problems of allocation without specific legislative mandate, it does not necessarily follow that they should extend the interpretation of a statute to create such a problem.

The long and the short of the matter is that we see no thwarting of legislative purpose by confining section 355(a)(3)(B) to the situations which Congress obviously had in mind at the time of its enactment. In so concluding, we are constrained to observe that, if respondent feels that a transaction of the type involved herein represents an obvious attempt to bail out earnings and profits in violation of the purpose behind section 355, he is not without his remedy. He can challenge such a transaction as a "device" under section 355(a)(1)(B).[8] He has chosen not to do so in this case, because of the conceded business purposes involved in implementing the antitrust decree and FCC order, and we are satisfied that he should not be permitted to avoid this channel of attack by means of an overly broad construction of section 355(a)(3)(B). Thus, while we agree

---

[7]There are obviously an infinite number of variations on the theme of this approach.

[8]Sec. 355(a)(1)(B) provides, in pertinent part, that a shareholder of a distributing corporation who receives stock of a controlled corporation pursuant to a sec. 355 distribution shall recognize no gain or loss on such distribution if—

the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both * * *

with respondent that business purpose is irrelevant to the proper construction of section 355(a)(3)(B), we do not agree with his contentions, that "Congress, in enacting section 355, intended to put direct distributions of stock of existing corporations *on a par* with indirect distributions of such stock through the use of holding companies [and that] the 'by reason of any transaction' language was specifically added to section 355(a)(3)(B) to make it clear that the section was to be applied not only to direct purchase of stock by distributing corporations, but also to *any conceivable indirect purchase of stock* within five years of the distribution." (Respondent's brief, at 40. Emphasis added.)

The absolutism of respondent's contentions is unacceptable. Essentially, respondent seeks to have us do what Congress might have done if the type of transaction involved herein had been brought to its attention. But it is not within the province of this Court thus to expand upon the handiwork of the legislature. *Clark v. Commissioner*, 86 T.C. 138 (1986); see also *Commissioner v. Stickney*, 399 F.2d 828, 834 (6th Cir. 1968), affg. 46 T.C. 864 (1966).

In view of the foregoing,

*Decision will be entered for the petitioner.*

Reviewed by the Court.

GOFFE, PARKER, WHITAKER, SHIELDS, HAMBLEN, COHEN, SWIFT, JACOBS, WRIGHT, and PARR, *JJ.*, agree with this opinion.

STERRETT, SIMPSON, WILBUR, CHABOT, NIMS, KÖRNER, CLAPP, GERBER, and WILLIAMS, *JJ.*, did not participate in the consideration of this case.